UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

AURELIUS CAPITAL MASTER, LTD.,

                Plaintiff,

                v.

THE REPUBLIC OF ARGENTINA,

                Defendant.

Case No.:  1:19-CV-0351 (LAP)

The Honorable Loretta A. Preska

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

NOVORIVER S.A.,

                Plaintiff,

                v.

ARGENTINE REPUBLIC,

                Defendant.

Case No.:  1:19-CV-09786 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

ACP MASTER, LTD.,

                Plaintiff,

                v.

THE REPUBLIC OF ARGENTINA,

                Defendant.

Case No.:  1:19-CV-10109 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -x

# THE REPUBLIC OF ARGENTINA'S MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

August 23, 2023

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

683 CAPITAL PARTNERS, LP,

          Plaintiff,

          v.

THE REPUBLIC OF ARGENTINA,

          Defendant.

Case No.: 1:19-CV-10131 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

ADONA LLC, EGOZ I LLC, EGOZ II LLC,
MASTERGEN, LLC, ERYTHRINA, LLC,
AP 2016 1, LLC, AP 2014 3A, LLC, AP
2014 2, LLC, AND WASO HOLDING
CORPORATION,

          Plaintiffs,

          v.

THE REPUBLIC OF ARGENTINA,

          Defendant.

Case No.:  1:19-CV-11338 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

APE GROUP SPA, ROMANO
CONSULTING SPA, ICARO SRL and
ELAZAR ROMANO,

          Plaintiffs,

          v.

THE REPUBLIC OF ARGENTINA,

          Defendant.

Case No.:  1:20-CV-10409 (LAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - -x

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ..........................................................................1

ARGUMENT ...............................................................................................9

I.   THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR THE REPUBLIC BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED THEIR THRESHOLD RIGHT TO BRING THESE CLAIMS .............................................................................9

   A.   Plaintiffs Do Not Dispute That They Have Not Complied with the Global Security's Preconditions for Bringing Suit. ......................9

   B.   Plaintiffs Point to No Evidence That These Claims Were Assigned to Them...............................................................13

   C.   WASO Cannot Evade the Prescription Clause. ..................................16

II.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE REPUBLIC BECAUSE PLAINTIFFS RAISE NO TRIABLE ISSUE AS TO THE CLAIMS OF BREACH THE COURT ALLOWED TO PROCEED TO DISCOVERY ......................................21

   A.   There Is No Triable Issue of Fact on Plaintiffs' Covenant of Good Faith and Fair Dealing Claim. ..................................................22

      1.   Plaintiffs Cannot Prove Bad Faith by Showing That the Republic Breached a Duty That the Court Has Held Does Not Exist. ..................................................22

      2.   With No Evidence of Bad Faith, Plaintiffs Cannot Prove a Breach of the Implied Covenant. .............................................25

      3.   Plaintiffs Point to No Admissible Evidence Creating a Triable Issue as to the Republic's Good Faith..........................27

   B.   There Is No Triable Issue of Fact Under Plaintiffs' Prevention Theory..................................................................39

   C.   Plaintiffs Abandon Their Theory That the Republic "Modified" the Global Security by Failing to Apply the Adjustment Fraction .....41

III.  THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE REPUBLIC OR, AT A MINIMUM, DENY PLAINTIFFS' MOTION BECAUSE PLAINTIFFS MISINTERPRET THE GLOBAL SECURITY ...................................................................44

  A.   The Adjustment Provision Must Be Read in Light of the Intended Operation of the Global Security. ......................................................45

  B.   The Plain Text of the Global Security Compels the Constant Factor Approach. ...................................................................................50

  C.   Plaintiffs' Interpretation Impermissibly Writes the Adjustment Provision and Other Terms out of the Contract. ...............................54

  D.   Plaintiffs' Interpretation Produces Commercially Unreasonable and Absurd Results. ...............................................................................57

       1.   An Issuer Would Not Decouple Payments on a GDP-Linked Security From Actual GDP. ...........................................57

       2.   Investors Would Not Accept a GDP-Linked Security Tied to a Single, Increasingly Obsolete, Base Year. .........................58

       3.   None of Plaintiffs' Other Arguments Demonstrate the Reasonableness of Their Interpretation. ...................................61

  E.   At a Minimum, the Global Security Is Ambiguous as to How an Adjustment Should Be Performed Upon a Rebasing. .........................62

IV.   THE COURT SHOULD DENY PLAINTIFFS' SUMMARY JUDGMENT MOTION BECAUSE THERE ARE TRIABLE ISSUES OF FACT ON THE APPLICATION OF THEIR VARIABLE FACTOR APPROACH ...........................................................63

V.    THE COURT SHOULD DENY PLAINTIFFS' SUMMARY JUDGMENT MOTION BECAUSE THE REPUBLIC'S AFFIRMATIVE DEFENSES RAISE TRIABLE ISSUES OF FACT...................................................................................................65

CONCLUSION.................................................................................................70

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*ACE Sec. Corp.* v. *DB Structured Prod., Inc.*,
    36 N.E.3d 623 (N.Y. 2015).................................................................................23

*Allbrand Appliance & Television Co.*,
    875 F.2d 1021 (2d Cir. 1989) ...........................................................................20

*Ape Group SPA* v. *Republic of Argentina*,
    2022 WL 463309 (S.D.N.Y. Feb. 15, 2022) ................................................16, 17

*Arrowgrass Master Fund Ltd.* v. *Bank of N.Y. Mellon*,
    965 N.Y.S.2d 473 (1st Dep't 2013).....................................................................54

*Aurelius Cap. Master, Ltd.* v. *Republic of Argentina*,
    2020 WL 70348 (S.D.N.Y. Jan. 7, 2020) ...................................................*passim*

*Aurelius Cap. Master, Ltd.* v. *Republic of Argentina*,
    2021 WL 1177465 (S.D.N.Y. Mar. 29, 2021)............................................*passim*

*Bickerstaff* v. *Vassar College*,
    196 F.3d 435 (2d Cir. 1999) ..............................................................................30

*Bluebird Partners, L.P.* v. *First Fidelity Bank, N.A.*,
    94 N.Y.2d 726 (2000) .................................................................................68, 69

*Brandon* v. *City of N.Y.*,
    705 F. Supp. 2d 261 (S.D.N.Y. 2010) ................................................................42

*Breitman* v. *Xerox Educ. Servs., LLC*,
    2013 WL 5420532 (S.D.N.Y. Sept. 27, 2013) ...................................................14

*Broder* v. *Cablevision Sys. Corp.*,
    418 F.3d 187 (2d Cir. 2005) ..............................................................................23

*BSC Assocs., LLC* v. *Leidos, Inc.*,
    91 F. Supp. 3d 319 (N.D.N.Y. 2015)..................................................................67

*Caldarola* v. *Calabrese*,
    298 F.3d 156 (2d Cir. 2002) ..............................................................................27

*Cambridge Cap. LLC* v. *Ruby Has LLC*,
565 F. Supp. 3d 420 (S.D.N.Y. 2021) ................................................................56

*Compania Embotelladora Del Pacifico, S.A.* v. *Pepsi Cola Co.*,
976 F.3d 239 (2d Cir. 2020) ................................................................24

*Corhill Corp.* v. *S. D. Plants, Inc.*,
9 N.Y.2d 595 (1961) ................................................................56

*In re Coudert Bros.*,
487 B.R. 375 (S.D.N.Y. 2013) ................................................................45

*Cruden* v. *Bank of New York*,
957 F.2d 961 (2d Cir. 1992) ................................................................9

*DeFabio* v. *E. Hampton Union Free Sch. Dist.*,
623 F.3d 71 (2d Cir. 2010) ................................................................36

*Dreni* v. *PrinterOn Am. Corp.*,
2021 WL 4066635 (S.D.N.Y. Sept. 3, 2021) ................................................................49, 50

*Eerie World Entm't, L.L.C.* v. *Bergrin*,
2004 WL 2712197 (S.D.N.Y. Nov. 23, 2004) ................................................................8, 65

*Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*,
837 F. Supp. 2d 162 (S.D.N.Y. 2011) ................................................................10

*Elliott Associates, L.P.* v. *Republic of Peru*,
961 F. Supp. 83 (S.D.N.Y. 1997) ................................................................66

*FDIC for Colonial Bank* v. *First Horizon Asset Securities Inc.*,
291 F. Supp. 3d 364 (S.D.N.Y. 2018) ................................................................20

*Galli* v. *Metz*,
973 F.2d 145 (2d Cir. 1992) ................................................................56

*Gary Friedrich Enterprises, LLC* v. *Marvel Characters, Inc.*,
716 F.3d 302 (2d Cir. 2013) ................................................................62

*Grewal* v. *Cuneo Gilbert & LaDuca LLP*,
2018 WL 4682013 (S.D.N.Y. Sept. 28, 2018) ................................................................40

*Gun Hill Rd. Serv. Station, Inc.* v. *ExxonMobil Oil Corp.*,
　　2013 WL 395096 (S.D.N.Y. Feb. 1, 2013) ................................................23, 24

*H.P.S. Capitol, Inc.* v. *Mobil Oil Corp.*,
　　588 N.Y.S.2d 29 (1992)................................................................................18, 20

*H/R Stone, Inc.* v. *Phoenix Bus. Sys., Inc.*,
　　660 F. Supp. 351 (S.D.N.Y. 1987) ....................................................................26

*Healy* v. *Rich Prod. Corp.*,
　　981 F.2d 68 (2d Cir. 1992) ................................................................................70

*Hexagon Securities LLC* v. *Leawood Bancshares, Inc.*,
　　2014 WL 1303516 (S.D.N.Y. Mar. 14, 2014)....................................................26

*Indep. Order of Foresters* v. *Donaldson, Lufkin & Jenrette Inc.*,
　　919 F. Supp. 149 (S.D.N.Y. 1996) ....................................................................70

*Iroquois Master Fund, Ltd.* v. *Quantum Fuel Sys. Techs.
　　Worldwide, Inc.*,
　　2013 WL 4931649 (S.D.N.Y. Sept. 12, 2013) ...................................................53

*Ixe Banco, S.A.* v. *MBNA Am. Bank, N.A.*,
　　2009 WL 3124219 (S.D.N.Y. Sept. 29, 2009) ...................................................40

*Jakobovits as Tr. of Lite Tr. I* v. *PHL Variable Ins. Co.*,
　　2023 WL 3741993 (E.D.N.Y. May 31, 2023)......................................................62

*Jeffreys* v. *City of New York*,
　　426 F.3d 549 (2d Cir. 2005) .........................................................................30, 36

*Justinian Cap. SPC* v. *WestLB AG*,
　　28 N.Y.3d 160 (2016)........................................................................................66

*Kabaru Corp.* v. *PBGC*,
　　1997 WL 759462 (S.D.N.Y. 1997)....................................................................40

*Klein* v. *Tabatchnick*,
　　610 F.2d 1043 (2d Cir. 1979) ............................................................................65

*Kulak* v. *City of New York*,
　　88 F.3d 63 (2d Cir. 1996) ..................................................................................33

*L. Debenture Tr. Co. of New York* v. *Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010) .................................................................54

*Lovatio* v. *Petróleos de Venezuela, S.A.*,
    2020 WL 5849304 (S.D.N.Y. Sept. 30, 2020) .....................................9

*Lykins* v. *IMPCO Techs., Inc.*,
    2018 WL 3231542 (S.D.N.Y. Mar. 6, 2018).........................................29

*Maxim Grp. LLC* v. *Life Partners Holdings, Inc.*,
    690 F. Supp. 2d 293 (S.D.N.Y. 2010) .................................................49

*MCI LLC* v. *Rutgers Cas. Ins. Co.*,
    2007 WL 4258190 (S.D.N.Y. Dec. 4, 2007).........................................40

*McMahan & Co.* v. *Wherehouse Entm't, Inc.*,
    859 F. Supp. 743 (S.D.N.Y. 1994) .....................................................10

*Melling* v. *Hamilton Point Investments, LLC*,
    2019 WL 235641 (E.D.N.Y. Jan. 16, 2019).........................................26

*Mellon Bank, N.A.* v. *United Bank Corp. of New York*,
    31 F.3d 113 (2d Cir. 1994) .................................................................63

*Merrill Lynch & Co. Inc.* v. *Allegheny Energy, Inc.*,
    500 F.3d 171 (2d Cir. 2007) .............................................................18

*Natixis Real Est. Cap. Tr. 2007-HE2* v. *Natixis Real Est.
    Holdings, LLC*,
    149 A.D.3d 127 (1st Dep't 2017) .......................................................57

*Newmont Mines Ltd.* v. *Hanover Ins. Co.*,
    784 F.2d 127 (2d Cir. 1986) .............................................................49

*O.F.I. Imports Inc.* v. *Gen. Elec. Cap. Corp.*,
    2017 WL 6734187 (S.D.N.Y. Dec. 29, 2017).....................................40

*In re PCH Assocs.*,
    949 F.2d 585 (2d Cir. 1991) .............................................................23

*Penades* v. *Republic of Ecuador*,
    2016 WL 5793412 (S.D.N.Y. Sept. 30, 2016) ...................................10

*Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.*,
   585 F. Supp. 3d 540 (S.D.N.Y. 2022) .......................................................3, 13, 16

*Phoenix Light SF Ltd.* v. *U.S. Bank Nat'l Ass'n*,
   612 F. Supp. 3d 263 (S.D.N.Y. 2020) ................................................................8

*PPS, Inc.* v. *Jewelry Sales Representatives, Inc.*,
   392 F. Supp. 375 (S.D.N.Y. 1975) ...................................................................37

*Racepoint Partners LLC* v. *JPMorgan Chase Bank*,
   2006 WL 3044416 (S.D.N.Y. Oct. 26, 2006)....................................................14

*Revson* v. *Cinque & Cinque, P.C.*,
   221 F.3d 59 (2d Cir. 2000) ...............................................................................63

*Rosen* v. *Sapir*,
   2021 WL 4523713 (S.D.N.Y. Sept. 30, 2021) ..................................................26

*Rowe* v. *Great Atl. & Pac. Tea Co.*,
   385 N.E.2d 566 (N.Y. 1978)..............................................................................23

*Royal Park Invs. SA/NV* v. *Wells Fargo Bank, N.A.*,
   2018 WL 739580 (S.D.N.Y. Jan. 10, 2018) ...........................................13, 14, 15

*Royal Park Invs. SA/NV* v. *HSBC Bank USA, N.A.*,
   2018 WL 679495 (S.D.N.Y. Feb. 1, 2018) ............................................14, 15, 16

*S. Rd. Assocs., LLC* v. *Int'l Bus. Machines Corp.*,
   4 N.Y.3d 272 (2005) .........................................................................................54

*SC Note Acquisitions, LLC* v. *Wells Fargo Bank, N.A.*,
   934 F. Supp. 2d 516 (E.D.N.Y. 2013) ...............................................................10

*Scholastic, Inc.* v. *Harris*,
   259 F.3d 74 (2d Cir. 2001) ..................................................................................7

*SEC* v. *Yorkville Advisors, LLC*,
   305 F. Supp. 3d 486 (S.D.N.Y. 2018) ...........................................................5, 42

*Security Plans, Inc.* v. *CUNA Mut. Ins. Soc.*,
   769 F.3d 807 (2d Cir. 2014) ..............................................................................26

*Semi-Tech Litig. LLC* v. *Bankers Tr. Co.*,
 272 F. Supp. 2d 319 (S.D.N.Y. 2003) ..........................................................15, 16

*Spanos* v. *Skouras Theatres Corp.*,
 364 F.2d 161 (2d Cir. 1966) ...............................................................................41

*Sprung* v. *Jaffe*,
 3 N.Y.2d 539 (1957) ...........................................................................................69

*Stern* v. *Gepo Realty Corp.*,
 45 N.E.2d 440 (N.Y. 1942) .................................................................................41

*Sunrise Mall Assocs.* v. *Imp. Alley of Sunrise Mall, Inc.*,
 621 N.Y.S.2d 662 (1995) ....................................................................................56

*Teachers Ins. & Annuity Ass'n of Am.* v. *CRIIMI MAE Servs. Ltd. P'ship*,
 763 F. Supp. 2d 665 (S.D.N.Y. 2011) ..........................................................3, 9, 10

*Thompson* v. *Advanced Armament Corp., LLC*,
 614 F. App'x 523 (2d Cir. 2015) .......................................................................25

*Thompson* v. *Gjivoje*,
 896 F.2d 716 (2d Cir. 1990) ...............................................................................49

*Tr. For the Certificate Holders of Merrill Lynch Mortg. Invs., Inc.* v. *Love Funding Corp.*,
 13 N.Y.3d 190 (2009) ...................................................................................66, 67

*Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*,
 487 F.3d 89 (2d Cir. 2007) ............................................................................25, 26

*True* v. *True*,
 882 N.Y.S.2d 261 (2d Dep't 2009).....................................................................70

*Two Farms, Inc.* v. *Greenwich Ins. Co.*,
 993 F. Supp. 2d 353 (S.D.N.Y. 2014) ...............................................................53

*Vermont Teddy Bear Co.* v. *538 Madison Realty Co.*,
 1 N.Y.3d 470 (2004) ...........................................................................................12

*Victor* v. *Riklis*,
 1992 WL 122911 (S.D.N.Y. May 15, 1992) .......................................................10

*W. & S. Life Ins. Co.* v. *U.S. Bank Nat'l Ass'n*,
173 N.Y.S.3d 543 (2022) .................................................................................7, 56

*Wagner* v. *JP Morgan Chase Bank*,
2011 WL 856262 (S.D.N.Y. Mar. 9, 2011) ......................................................25

*Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*,
127 F. Supp. 3d 156 (S.D.N.Y. 2015) .................................................................58

*WG Sec. Prod., Inc.* v. *Tyco Int'l Ltd.*,
2006 WL 5671239 (C.D. Cal. Mar. 6, 2006) ......................................................37

*Wilder* v. *World of Boxing LLC*,
310 F. Supp. 3d 426 (S.D.N.Y. 2018) .................................................................35

*Zakrzewski* v. *Luxoft USA, Inc.*,
151 A.D.3d 573 (1st Dep't 2017) .........................................................................26

## Statutes

N.Y. Judiciary Law § 489 ...............................................................................66, 69

## Other Authorities

Black's Law Dictionary (11th ed.) ...........................................................................11

Oxford English Dictionary (3d ed. 2010) .................................................................11

Restatement (Second) of Contracts (1981) ...............................................................45

Williston on Contracts (4th ed.) ...............................................................................40

## PRELIMINARY STATEMENT

Plaintiffs' brief reads as though this Court were writing on a clean slate in this four-year-old litigation. In fact, the Court has already correctly rejected the case that Plaintiffs *wanted* to litigate, holding (back in *January 2020*) that Plaintiffs' breach of contract claim failed because "the Global Security unequivocally states that the defined term Actual Real GDP refers to a version of the Republic's gross domestic product *that is published by INDEC*." *Aurelius Cap. Master, Ltd.* v. *Republic of Argentina*, 2020 WL 70348, at *7 (S.D.N.Y. Jan. 7, 2020) ("*Aurelius I*") (emphasis added). While "sympathiz[ing] with [Plaintiffs'] practical plight," because INDEC "discontinu[ed] the publication of Actual Real GDP using constant 1993 prices," the Court squarely held the Republic had no contractual obligation to cause INDEC to publish that figure. *Id.* at *7 & n.7. Plaintiffs could prevail only by showing "that the Republic breached the covenant of good faith and fair dealing by rebasing its GDP in a manner *deliberately designed to avoid making payment* under the Global Security." *Id.*

In March 2021, the Court reiterated that the Republic had no obligation to "compel INDEC to publish data," including Actual Real GDP in the 1993 base year. *Aurelius Cap. Master, Ltd.* v. *Republic of Argentina*, 2021 WL 1177465, at *9 (S.D.N.Y. Mar. 29, 2021) ("*Aurelius II*"). But Plaintiffs' allegations were "sufficient to state a claim that the Republic *sought to deprive Plaintiffs of payment*

for the 2013 Reference Year by causing INDEC not to publish the data necessary to make such a calculation." *Id.* at *11 (emphasis added).  The Court also held that Plaintiffs plausibly alleged that the Republic "modified" the Securities when calculating whether payment was due for 2013 by "eschewing the Adjustment Fraction calculation." *Id.* at *9.

In opposing the Republic's motion for summary judgment (and advancing their own), Plaintiffs seek to go back to square one by making the "primary issue" here "how to interpret the Adjustment Provision." (Pls.' Br. 1.)  As explained below, Plaintiffs' interpretation is wrong.  More fundamentally, though, right or wrong, Plaintiffs cannot escape their burden of proving that (i) "the Republic *caused* INDEC to stop publishing data *to obscure* the fact that a payment was due"; and (ii) the Republic "fail[ed] to apply the Adjustment Fraction to Base Case GDP." *Aurelius II*, 2021 WL 1177465, at *4, *11 (emphasis added).  On those two issues, the record is clear:  INDEC's decision to stop publishing GDP in the 1993 base year had nothing to do with these Securities, and the Republic carefully applied the Adjustment Fraction in concluding that no payment was due.  (Arg. Br. 15-22, 31-39.)

For these reasons—and because Plaintiffs cannot even clear the threshold barriers to their claims—the Court should grant the Republic's motion for summary judgment and deny Plaintiffs' motion.  The Court need not go further, but if it does, it should reach the same result because Plaintiffs misinterpret the Global Security by

placing undue emphasis on two words, while ignoring the rest of its terms and the circumstances surrounding its execution.

***Threshold Barriers to Plaintiffs' Claims***.  There is no evidence that Plaintiffs even have the right to assert their claims.  (Arg. Br. 25-31.)  Plaintiffs concede that they skipped past the detailed prerequisites for bringing suit set out in the No-Action Clause of the Global Security (Arg. Br. 25-26; Pls.' Br. 63-67), but say they are entitled to sue under Section 4.9 of the Trust Indenture.  That provision, however, only allows individual actions for "principal" and "interest thereon."  Payments under the Global Security are neither.  Plaintiffs' failure to comply with the requirements set out in the No-Action Clause is fatal to their claims.  *See Teachers Ins. & Annuity Ass'n of Am.* v. *CRIIMI MAE Servs. Ltd. P'ship*, 763 F. Supp. 2d 665, 671 (S.D.N.Y. 2011), *aff'd*, 481 F. App'x 686 (2d Cir. 2012).  (*Infra* I.A.)

Plaintiffs also cannot prove, after years of discovery, that they acquired claims for nonpayment on the 2013 Reference Year when they bought their Securities (long after they claim payment was due).  Courts require *evidence* that post-breach purchasers (like most Plaintiffs) either were *assigned* the claims or purchased the securities in a jurisdiction where such assignments occur as a matter of law.  (*See* Arg. Br. 26-27; *Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d 540, 565 (S.D.N.Y. 2022).)  Plaintiffs admit that they have no such evidence

(Pls.' Br. 67-72) and are reduced to advancing unpersuasive policy arguments to try to change the law.  (*Infra* I.B.)

Finally, WASO's claims with respect to 80% of its Securities are untimely. (Arg. Br. 28-31.) ████████████████████████████████████ ████████████████████████████ (Pls.' Resp. SOF ¶ 225.) Its scattershot efforts to evade the Prescription Clause—as "unenforceable" or "ambiguous"—all fail as a matter of law.  (*Infra* I.C.)

***There Is No Triable Issue of Fact on the Theories of Breach That This Court Allowed to Proceed to Discovery***.  Despite an enormous amount of discovery—including 36 depositions and the production of more than 600,000 pages of documents—Plaintiffs have no evidence that the Republic prevented INDEC from publishing real GDP for 2013 in the 1993 year of base prices in order "to obscure the fact that a payment was due" or modified the Global Security by "failing to apply the Adjustment Fraction to Base Case GDP."  *Aurelius II*, 2021 WL 1177465, at *4, *11.

With respect to their implied covenant of good faith and fair dealing claim, Plaintiffs largely try to sidestep the burden this Court imposed on them in *Aurelius I* and *II*—coming forward with proof of bad faith.  Instead, Plaintiffs try to claim that the Republic breached the covenant regardless of intent because there was an "implied" obligation to publish Actual Real GDP in the obsolete 1993 base, but the

Court has already (rightly) rejected this argument as a matter of law. *Aurelius II*, 2021 WL 1177465, at *9-10. (*Infra* II.A.1.) Plaintiffs also are wrong in contending that they can prevail under the implied covenant merely by showing that the Republic's actions had "the effect" of harming their contractual rights (they have not), *without showing* bad faith or other "wrongful" conduct. (*Infra* II.A.2.) Plaintiffs ultimately make a half-hearted effort to identify evidence of bad faith but point to nothing that can overcome the uncontradicted testimony of the key officials involved, all of whom confirm that the Republic and INDEC scrupulously carried out their duties. (*Infra* II.A.3.) For these same reasons, Plaintiffs' claims under the prevention doctrine—a corollary of the implied covenant—also fail. (*Infra* II.B.)

Plaintiffs have also abandoned their theory that the Republic "modified" the Securities by failing to adjust Base Case GDP *at all* using the Adjustment Fraction. Plaintiffs advance a new, unpled theory that the Republic applied the Adjustment Fraction *incorrectly* (Pls.' Br. 44-45)—but it is far too late for that. *See SEC* v. *Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 531 (S.D.N.Y. 2018). Plaintiffs also cannot raise a triable issue on their new theory given the deference owed to the Ministry of Economy's calculations under the Global Security. (*Infra* II.C.)

***Plaintiffs Misread the Adjustment Provision***. There is no evidence that *anyone*—within the Republic or in the investing community—understood the Securities to mean what Plaintiffs now claim (the Variable Factor Approach) when

the Securities were issued in 2005.  And for good reason—the Variable Factor Approach, which would require tying the Securities to the obsolete 1993 base series through the expiration of the Securities in 2035, makes no sense. Plaintiffs' interpretation was advanced far later, and, even then, was considered an "alternative interpretation" that "makes less economic sense" by most analysts who followed these securities.  (Arg. Ex. 131 (April 1, 2014 HSBC Report); *see also* Arg. Ex. 132 (April 8, 2014 Bank of America Report).)[1]  Plaintiffs ignore the context in which these Securities were issued, which overwhelmingly shows that all parties understood that payments would be due only if the Republic's real GDP was growing at a healthy rate of 3% or more—the central premise of the Republic's interpretation (the Constant Factor Approach).  (*Infra* III.A.)

Plaintiffs' interpretation also misreads the language of the Adjustment Provision and the governing documents.  Their Variable Factor Approach turns entirely on reading two words ("each" and "such") in isolation from the rest of the contract.  (Pls.' Br. 33-36.)  But read as a whole, the governing documents confirm that the Constant Factor Approach was intended from the outset.  For example, the Trust Indenture contains an entire section dedicated to covenants—but none that

---

[1] References to "Arg. Ex. _" are to the Declaration of Robert J. Giuffra, Jr. dated April 14, 2023, and the Declaration of Robert J. Giuffra, Jr. dated August 23, 2023 filed herewith.  References to "Opening," "Rebuttal," or "Reply" reports refer to the parties' expert reports, filed as exhibits to the Giuffra Declaration.

requires INDEC to continue publishing GDP in 1993 base prices through 2034, even though that figure is required for Plaintiffs' Variable Factor Approach.  (*Infra* III.B.)

Plaintiffs also do not dispute that their interpretation renders the Adjustment Provision and the definition of "Year of Base Prices" superfluous, which is contrary to settled New York law.  *W. & S. Life Ins. Co.* v. *U.S. Bank Nat'l Ass'n*, 173 N.Y.S.3d 543, 549 (2022).  (*Infra* III.C.)  And Plaintiffs cannot justify the commercially unreasonable results of their interpretation.  No one would expect, for example, the Securities to measure economic growth by reference to obsolete statistics or to pay out in years of *negative* growth.  (*Infra* III.D.)

The Republic's interpretation—dubbed the "mainstream interpretation" by market commentators—is, at a minimum, reasonable and Plaintiffs' motion should be denied for this reason.  (Ex. 131 (April 1, 2014 HSBC Report) -0379-80; *see also Scholastic, Inc.* v. *Harris*, 259 F.3d 74, 82 (2d Cir. 2001).)  (*Infra* III.E.)

***The Court Cannot Grant Summary Judgment to Plaintiffs Because Triable Issues of Fact Exist on How to Apply Plaintiffs' Variable Factor Approach***.  Even if the Court accepts Plaintiffs' Variable Factor Approach, it should deny Plaintiffs' motion for the additional reason that there are triable issues of fact over how to implement it.  Plaintiffs again propose EMAE as a substitute for 2013 real GDP in 1993 base prices, but this Court has already rejected this use of "alternate statistics not contemplated by the Global Security's plain terms." *Aurelius I*, 2020 WL 70348,

at *7.  By contrast, the Republic's expert on national accounts statistics, Prof. Glenn Hubbard, uses *official INDEC GDP data* to calculate the payments, if any, owed under the Variable Factor Approach.  While Plaintiffs' expert disagrees with Prof. Hubbard's approach, that means that the calculation methodology under Plaintiffs' interpretation is a fact issue for trial.  *Eerie World Entm't, L.L.C.* v. *Bergrin*, 2004 WL 2712197, at *3, n.32 (S.D.N.Y. Nov. 23, 2004).  (*Infra* IV.)

> ***Triable Issues of Fact Also Exist on the Republic's Affirmative Defenses***.
The Republic's defenses also raise material factual disputes for trial.  With respect to champerty, Plaintiffs assert that they "purchased the GDP Warrants because they perceived them to be good investments."  (Pls.' Br. 73.)  The record shows that, in fact, nearly every Plaintiff acquired its Securities to bring this lawsuit.  Regardless, "the intent and purpose of an assignee is usually a factual question that cannot be decided on summary judgment."  *Phoenix Light SF Ltd.* v. *U.S. Bank Nat'l Ass'n*, 612 F. Supp. 3d 263, 281 (S.D.N.Y. 2020).  That is the case here.  For nearly all of their purchases, Plaintiffs also have no evidence that they are entitled to the safe harbor from New York's champerty prohibition.  With respect to mutual mistake, if the Court adopts the Variable Factor Approach, there are issues of fact about the parties' understanding of the terms of the contract at the time of issuance.  (*Infra* V.)

## ARGUMENT

**I.     THE COURT SHOULD GRANT SUMMARY JUDGMENT FOR THE REPUBLIC BECAUSE PLAINTIFFS HAVE NOT ESTABLISHED THEIR THRESHOLD RIGHT TO BRING THESE CLAIMS.**

### A.     Plaintiffs Do Not Dispute That They Have Not Complied with the Global Security's Preconditions for Bringing Suit.

The Global Security's "Enforcement" provision is clear:  "no Holder of a Security *shall have any right . . . to institute any suit, action or proceeding*," without first satisfying five pre-conditions for bringing suit, including giving notice to (and indemnifying) the Trustee.  (Arg. Ex. 37 (2005 Global Security) at R-13 (emphasis added); Arg. Br. 25-26.)[2]  No-Action Clauses such as this are designed to "make it more difficult" to bring individual lawsuits like Plaintiffs', *Lovatio* v. *Petróleos de Venezuela, S.A.*, 2020 WL 5849304, at *3 (S.D.N.Y. Sept. 30, 2020), and are "strictly construed," *Cruden* v. *Bank of New York*, 957 F.2d 961, 968 (2d Cir. 1992).  Plaintiffs concede (through silence) that they have not satisfied the No-Action Clause.  (Pls.' Br. 63-67.)  This is reason alone to grant the Republic summary judgment.  *See Teachers Ins. & Annuity Ass'n of Am.*, 763 F. Supp. 2d at

---

[2] Section 4.8 of the Trust Indenture is materially identical to Section 11 of the 2005 Global Security. (Arg. Br. 25; Pls.' Resp. SOF ¶ 205.)  All references to the Global Security are to the 2005 Global Security, which "contain[s] the same material terms" as the 2010 Global Security.  *Aurelius II*, 2021 WL 1177465, at *2.

671 (granting summary judgment where "there [was] no genuine issue of fact as to whether plaintiffs complied with the no action clause. They did not.").[3]

Plaintiffs say that they are excused from complying with the No-Action Clause because they may bring their claims under Section 4.9 of the Indenture.  (Pls.' Br. 64-66.)  This unpled theory is wrong as a matter of law.  Section 4.9 applies only to claims for "*principal of* and *interest on* [a] Debt Security on the stated maturity date."   (Arg. Ex. 35 (Trust Indenture) at 25 (emphasis added).)   The "debt securit[ies]" governed by the Indenture include the ordinary bonds issued as part of the larger 2005 and 2010 debt restructuring.  (*Id.* at Recital 1; Arg. Supp. SOF ¶ 2.) Those bonds pay "principal" and "bear interest."  (Arg. Supp. SOF ¶¶ 7-10, 14.)  The Securities do not.  The Global Security says on the very first page:  "HOLDERS OF THIS SECURITY ARE NOT ENTITLED TO RECEIVE PRINCIPAL IN THE AMOUNT OF, OR INTEREST BASED ON, SUCH NOTIONAL AMOUNT." (Arg. Ex. 37 (2005 Global Security) at 1.)  The Prospectuses confirm this point:  (i)

---

[3] *See also McMahan & Co.* v. *Wherehouse Entm't, Inc.*, 859 F. Supp. 743, 749 (S.D.N.Y. 1994), *aff'd in part, rev'd in part on other grounds*, 65 F.3d 1044 (2d Cir. 1995) ("Plaintiffs did not comply with the No Action Clause . . . Summary judgment for Defendants is granted on these claims."); *Penades* v. *Republic of Ecuador*, 2016 WL 5793412, at *2 (S.D.N.Y. Sept. 30, 2016), *aff'd*, 690 F. App'x 733 (2d Cir. 2017); *SC Note Acquisitions, LLC* v. *Wells Fargo Bank, N.A.*, 934 F. Supp. 2d 516, 532-33 (E.D.N.Y. 2013), *aff'd*, 548 F. App'x 741 (2d Cir. 2014); *Ellington Credit Fund, Ltd.* v. *Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 184-86 (S.D.N.Y. 2011); *Victor* v. *Riklis*, 1992 WL 122911, at *6-7 (S.D.N.Y. May 15, 1992).

"[the] GDP-linked Securities do not represent a right to receive principal or interest payments"; (ii) "[t]he New Securities will . . . pay principal and interest (or, in the case of GDP-linked securities, make payments in accordance with their terms)"; (iii) "[t]here are no principal payments in respect of the GDP-linked Securities"; and (iv) "[t]he GDP-linked Securities will not evidence principal."  (Arg. Ex. 252 (2005 Prospectus Supplement) at S-25, S-38, S-61, S-64; Arg. Ex. 253 (2010 Prospectus Supplement) at S-48, S-67, S-103-104, S-106; Arg. SOF ¶ 211; Arg. Supp. SOF ¶¶ 11-13, 15.)

Plaintiffs respond by asserting that payments on the Securities must be principal or interest because the contract "does not characterize" them as something else. (Pls.' Br. 67).  This is wrong.  The first page describes them as "payments contingent upon and determined on the basis of the performance of the gross domestic product of the Republic of Argentina."   (Arg. Ex. 37 (2005 Global Security) at 1.)  Payments contingent on GDP are not "principal," which means a "sum of money lent or invested, on which interest is paid."   Oxford English Dictionary (3d ed. 2010); *see also* Black's Law Dictionary (11th ed.) ("the amount of a debt, investment or other fund, not including interest, earnings, or profits."). Nor are they "interest," which is "money paid regularly at a particular rate for the use of money lent, or for delaying the repayment of a debt"—much less "interest on" any "principal" as Section 4.9 specifies.  Oxford English Dictionary (3d ed. 2010).

Plaintiffs also argue that Securities holders must be able to proceed under Section 4.9 because it is mentioned in the No-Action Clause. (Pls.' Br. 65-66 (quoting portions of Arg. Ex. 37 § 11, which states that the No-Action Clause applies "[e]xcept as provided in Section 4.9 of the Indenture. . .").) This argument rests on selective quotation. The No-Action Clause refers to holders' right to enforce payment obligations via Section 4.9 only in a limited circumstance: "as this Security may be amended or modified pursuant to Paragraph 22." (Arg. Ex. 37 § 11.) If the Securities were modified to provide for principal or interest payments, then a holder could rely on Section 4.9. Absent such a modification, Section 4.9 by its plain terms does not apply, and a cross reference to that provision does not expand its scope. Had the parties intended Section 4.9 to allow individual lawsuits for *any payments due*—instead of just claims for "principal" or "interest"—they would have said so. *See Vermont Teddy Bear Co.* v. *538 Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004) ("[C]ourts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.") (internal quotations omitted).[4]

---

[4] The *Palladian* decision of the English court invoked in a footnote (Pls.' Br. 66 n.21) does not help Plaintiffs. The Claimants there *did* comply with the No-Action Clause. (*See* Arg. Ex. 178 (Palladian Judgment) ¶ 284.)

-12-

## B.    Plaintiffs Point to No Evidence That These Claims Were Assigned to Them.

It is undisputed that Plaintiffs bear the burden of proving their right to sue under these Securities.  (Arg. Br. 3-4 (citing, *e.g.*, *Phoenix Light SF Ltd.* v. *Deutsche Bank Nat'l Tr. Co.*, 585 F. Supp. 3d at 565); Pls.' Br. 67-72.)  Here, that means that Plaintiffs who bought their securities *after* the alleged cause of action accrued (no later than December 15, 2014) must prove that **each** subsequent holder in the chain of custody, including themselves, (i) was expressly assigned the right to sue for the payment they claim is due; or (ii) acquired their Securities under the law of a jurisdiction where such assignments were automatic.  (Arg. Br. 26-27 (citing, *e.g.*, *Royal Park Invs. SA/NV* v. *Wells Fargo Bank, N.A.*, 2018 WL 739580, at *14 (S.D.N.Y. Jan. 10, 2018).)  Plaintiffs have no such evidence, even though the Republic requested it during discovery.  (*See* Pls.' Br. 67-72; Arg. Br. 27.)  Plaintiffs instead advance a litany of superficial arguments for why they should not have to prove their right to sue.  (Pls.' Br. 67-72.)  The Court should reject them.

For starters, Plaintiffs gloss over the substantial body of law holding that standing to sue is not automatic (Pls.' Br. 69-72) by asserting that the Republic's cases "[a]ll involved claims against trustees" (Pls.' Br. 71).  But what mattered in these cases was not the *identity* of the defendant but *the plaintiff*'s inability to prove that it possessed the right to sue under the instrument.  *See Phoenix Light SF Ltd.*, 585 F. Supp. 3d at 565 (granting summary judgment where plaintiffs failed to

"demonstrate their standing to sue for claims related to each [underlying security]");
*Racepoint Partners LLC* v. *JPMorgan Chase Bank*, 2006 WL 3044416, at *5
(S.D.N.Y. Oct. 26, 2006) (plaintiffs failed "to show that New York law governed
every prior transfer of the notes at issue . . . such that their transferr[or]s would have
automatically acquired the claims of all the previous noteholders"); *Royal Park*,
2018 WL 739580, at *14 ("a current or former holder of a [security] must show that
it has retained the litigation rights associated with that [security]").

Plaintiffs contend that "the only natural reading of the contract is that the
beneficial owner at the time the suit is brought" has the right to sue.  (Pls.' Br. 68.)
But breach of contract claims accrue "at the time of the breach."  *Breitman* v. *Xerox
Educ. Servs., LLC*, 2013 WL 5420532, at *5 (S.D.N.Y. Sept. 27, 2013) (internal
quotations omitted).  That is why courts have held that "the fact that [p]laintiffs
*currently hold* the [securities] does not establish their standing as to losses incurred
by previous []holders."  *Royal Park Invs. SA/NV* v. *HSBC Bank USA, N.A.*, 2018
WL 679495, at *3 (S.D.N.Y. Feb. 1, 2018) (emphasis added).  Nothing in the Global
Security or the Indenture purports to depart from this rule by automatically
transferring claims that belong to the beneficial owner *at the time of breach* to *each*
subsequent beneficial owner.  Nor is there anything "absurd" about allowing the
owner of securities at the time of a breach to sell those securities and then "bring suit
to collect on the missed payment."  (Pls.' Br. 68-69.)  To the contrary, courts have

recognized that it is "common to divorce the litigation rights from the underlying securities." *Royal Park Invs.*, 2018 WL 739580 at *14.[5]

In a last gasp, Plaintiffs claim that, under New York law, litigation rights are assigned automatically upon acquisition of securities. (Pls.' Br. 70-71.) This is a sleight of hand. The question of what law governs the operation of securities (New York law here) is separate from the question of what law governs the *transfer* of securities (which Plaintiffs have never established (Arg. Br. 26-27)). Thus, choice of law provisions "which state that the [securities] themselves are governed by New York law, do not dictate the governing law for the separate contracts transferring these [securities] from one holder to the next." *Royal Park Invs.*, 2018 WL 679495, at *5; *Semi-Tech Litig. LLC* v. *Bankers Tr. Co.*, 272 F. Supp. 2d 319, 330 (S.D.N.Y.

---

[5] Plaintiffs assert that different plaintiffs "could collect on the same payment depending upon how the payment was made." (Pls.' Br. 69.) Not so. Only the owner of *the claim* (whether originally or by assignment) could collect on whatever payment amount was due. *See, e.g.*, *Royal Park Invs.*, 2018 WL 679495 at *6 n.4 ("[B]ecause an assignor of a [security] must either retain its claims or transfer them with the assignment, only one [security]holder in a given chain of title can have standing to sue for a particular injury."). Plaintiffs also say that the Republic did not challenge plaintiffs' right to sue in other lawsuits based on other bonds. (Pls.' Br. 68.) Plaintiffs submitted no evidence that the facts and law in both circumstances were the same (they were not). In any event, a decision not to raise an argument in a prior lawsuit has no bearing on a later, unconnected case.

2003) (governing law of the indenture had "'no relevance to the question whether the contracts of sale [of bonds] . . . operated to assign certain rights of action'").[6]

### C.   WASO Cannot Evade the Prescription Clause.

Section 14 of the Global Security (entitled "<u>Prescription</u>") states that:   "*All claims* against the Republic for *any amounts due* hereunder (including Additional Amounts) shall be prescribed *unless made* within five years from the date on which such payment first became due, or a shorter period if provided by law." (Arg. Ex. 37 (Global Security) at R-14 (emphasis added).)   This provision "prescribes the Republic's obligation to pay where the security holder fails to assert a right to payment within the five-year period." *Ape Group SPA* v. *Republic of Argentina*, 2022 WL 463309, at *3 (S.D.N.Y. Feb. 15, 2022).

████████████████████████████████████████████████████

████████████████████████████████████████████████████ (Pls.'

Resp. SOF ¶¶ 223-25.)   Accordingly, WASO did not timely "make" any "claim" for

---

[6]  Plaintiffs' footnoted argument that "New York law would apply to [their] purchases under a 'center-of-gravity' analysis" (Pls.' Br. 70 n.23) gets them nowhere.  Under that analysis, courts look to several factors, including the (1) "place of contracting"; (2) "places of negotiation and performance"; (3) "location of the subject matter"; and (4) "domicile or place of business of the contracting parties." *Phoenix Light*, 585 F. Supp. 3d at 564.  Even assuming it applies, "Plaintiffs have not come forward with the evidence necessary to demonstrate what law applies under New York's center of gravity test," *id.* at 565, for *any* transactions dating back to December 2014, when the claim arose, *Royal Park Invs.*, 2018 WL 679495, at *4 (center of gravity analysis "would be necessary for *each* transfer in the chain from the original [security]holder").  (*See* Arg. SOF ¶ 221.)

the "amounts due" associated with these additional Securities, and those claims are time-barred.  (Arg. Br. 28-31.)  None of WASO's creative theories for evading this result has merit.  (Pls.' Br. 75-84.)

1.     WASO argues that it satisfied the Prescription Clause's requirements because its initial complaint asserted that "Argentina was contractually obligated to make a Payment Amount of at least USD $0.07680 <u>per notional dollar</u> on December 15, 2014."  (Pls.' Br. 76.)  But this general statement of potential amounts due for *all* holders is immaterial. The Prescription Clause requires a security holder to "make" a "claim," which means "[t]he assertion of an *existing* right."  (Pls.' Br. 76-77; *see also Ape Group*, 2022 WL 463309, at *3 (same).)  When filing its initial complaint, WASO had no "existing right" to the amount it now seeks to recover associated with its later acquisition of over 80% of its Securities (or the total Payment Amount for that matter).

2.     WASO argues that the Prescription Clause does not cover "systemic breaches," like "ignor[ing] the contract" and "fail[ing] to publish contractually necessary data."  (Pls.' Br. 78-79.)  WASO cites literally no support for the theory that the clause applies for certain breaches ("non-systemic" ones) but not others ("systemic" breaches).  The clause prescribes "*all claims* against the Republic for *any amounts* due hereunder" after five years.  (Arg. Ex. 37 at R-14 (emphasis added); *Ape Group*, 2022 WL 463309, at *3 (quoting Global Security).)

3.    WASO contends that the "Prescription Clause is unenforceable" because the Republic "breached its notice obligations under the Global Security" by not announcing that a payment was due and then "actively denying any payment [was] due." (Pls.' Br. 81-82.)  Plaintiffs cite no authority that supports this argument either.[7]  It also makes no sense.  The Prescription Clause would serve no purpose if plaintiffs could allow their claims to expire and then assert them anyway on the theory that Republic previously denied any breach. *See H.P.S. Capitol, Inc.* v. *Mobil Oil Corp.*, 588 N.Y.S.2d 29, 30 (1992) (noting "societal interest . . . 'of giving repose to human affairs'" furthered by prescription clauses).

4.    WASO argues that the Prescription Clause is "ambiguous" because "Section 2(e) explicitly contemplates a right to payment after the five-year prescription period."  (Pls.' Br. 79-80.)  There is not even an arguable ambiguity.  This provision states that after five years, any "unclaimed" monies may be returned by the Trustee to the Republic, and thereafter holders may only look "to the Republic for *any payment* to which such Holder *may be entitled*."  (Arg. Ex. 37 at R-6 (emphasis added).)  The language limits the Trustee's duties after five years.  It does

---

[7] The lone case cited by Plaintiffs did not even involve a prescription clause. *Merrill Lynch & Co. Inc.* v. *Allegheny Energy, Inc.*, 500 F.3d 171, 187 (2d Cir. 2007) (assessing whether breaches of warranties occurred and were material).

not say that the Republic has an obligation to make any payments first claimed more than five years after they became due.

5.     Finally, WASO invokes the "relation back" doctrine—contending that its initial complaint (relating to 20% of its current holdings) was enough to put the Republic on "notice of the subject matter of the dispute," as long as the Republic "was not prejudiced."  (Pls.' Br. 82-83.)  WASO recognizes that the relation back doctrine does not "typically" apply in these circumstances (Pls.' Br. 82) and unsurprisingly cites no case where any court has *ever* allowed relation back to trump a contractual prescription clause.  Nor do any of the cases WASO cites outside of the prescription context (*id.* at 75-84) address the rule that relation back cannot be used to satisfy "a contractual condition precedent to asserting a claim"—like the Prescription Clause.  (Arg. Br. 30 (collecting cases).)[8]  Plaintiffs try to distinguish some authorities on the basis that the plaintiffs there tried to satisfy the condition precedent after the *statute of limitations* had expired.  (Pls.' Br. 77 n.32.)  But Plaintiffs provide no reason why the result should be different for a *contractual prescription* clause, and there is none.

---

[8] WASO cites *Palladian*, noting that the *English* court applied English relation back law.  (Pls.' Br. 84 n.36.)  But the English claimants brought suit from the start *on behalf of all Holders* of the Euro-denominated Securities; in contrast WASO only sued "with respect to their beneficial holdings" and had no basis to pursue the claims of others.  (Adona SAC, ECF No. 40-1 ¶ 29.)

It also makes no sense to apply relation back in this context.  As WASO acknowledges, the claims in the hands of the holders from whom they bought their additional Securities had expired.  (*Id.* at 82.)  WASO never explains how it could resuscitate those claims and thereby take more than the sellers had to give.  The logical consequence of WASO's position is that any reference by *any individual* plaintiff to the total dollar amount of a "Missed Payment" would obviate the need for *any* other holders to comply with the Prescription Clause's notice requirements. This would defeat the purpose of contractual prescription.  *See Allbrand Appliance & Television Co.*, 875 F.2d 1021, 1025 (2d Cir. 1989) ("policy reasons" counsel against application of relation back where it would be used "to provide a means either to circumvent or to expand" the relevant limitations period); *H.P.S. Capitol*, 588 N.Y.S.2d at 30 (prescription periods further "a societal interest or public policy 'of giving repose to human affairs'").

The relation back doctrine is meant to correct "an inconsequential pleading error."  *FDIC for Colonial Bank* v. *First Horizon Asset Securities Inc.*, 291 F. Supp. 3d 364, 374 (S.D.N.Y. 2018)).  "Allowing a plaintiff to obtain recovery for a claim which was never asserted until after it was time-barred" does not serve that goal— and instead abrogates "a [contractual] substantive right."  *Id.*

## II.   THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE REPUBLIC BECAUSE PLAINTIFFS RAISE NO TRIABLE ISSUE AS TO THE CLAIMS OF BREACH THE COURT ALLOWED TO PROCEED TO DISCOVERY.

This Court, applying New York law, was clear in *Aurelius I* and *II* that Plaintiffs' interpretation of the Global Security did not state a claim for relief because it depended on a figure (Actual Real GDP in 1993 base prices) that was never published by INDEC, and that the Republic was not contractually obligated to procure.  2020 WL 70348, at *6-7; 2021 WL 1177465, at *3, *9.  The absence of any express or implied obligation to publish GDP in the 1993 base year is why Plaintiffs pivoted to prosecuting three different claims that the Court found plausible but required discovery:

1. The Republic breached the implied covenant of good faith and fair dealing because it "*caused* INDEC to stop publishing data *to obscure* the fact that a payment was due";

2. The Republic wrongfully "*caused* the unavailability of information that deprived Plaintiffs of a contractual right to payment," *i.e.*, the "prevention" doctrine (which this Court left open though it doubted the doctrine was "applicable here"); and

3. The Republic "breached the Global Securities' Modification Provision," by "using unadjusted figures to calculate the Payment Amount for the 2013 Reference Year."

-21-

*Aurelius II*, 2021 WL 1177465, at \*9-12 (emphasis added).  The Court then ordered the parties to proceed to determine "[w]hether discovery will bear out Plaintiffs' contentions."  *Id.*, at \*12.  It has not.

### A. There Is No Triable Issue of Fact on Plaintiffs' Covenant of Good Faith and Fair Dealing Claim.

#### 1. Plaintiffs Cannot Prove Bad Faith by Showing That the Republic Breached a Duty That the Court Has Held Does Not Exist.

Ignoring the Court's prior rulings, Plaintiffs contend that their implied covenant claim can proceed because investors "would be justified in understanding the Republic impliedly promised to publish 2013 Actual Real GDP measured in constant 1993 prices where doing so was necessary to avoid depriving holders of a payment that was due."  (Pls.' Br. 46; *see also id.* at 47-49.)  This is just déjà vu.

1. This Court has *twice* recognized that "the Republic was under no explicit contractual obligation to continue to calculate Actual Real GDP using constant 1993 prices."  *Aurelius II*, 2021 WL 1177465, at \*3 (quoting *Aurelius I*, 2020 WL 70348, at \*7 n.7).  Plaintiffs now concede this point.  (Pls.' Br. 48 ("[T]here is no express contractual obligation to provide the information").)  Importantly, this Court then held, in *Aurelius II*, that it would not read into the terms of the Global Security any implied obligation to produce Actual Real GDP in the 1993 base series.  Plaintiffs "could have bargained for a provision requiring INDEC to calculate and publish that data in all circumstances," but "the Global Securities

-22-

do not include such a term," and "[t]he Court will not impose such a substantive obligation on the Republic."  2021 WL 1177465, at *10.  The Court's holding was supported by a long line of cases applying settled New York Law.  *Id.* at *9-10.

2.    Plaintiffs say the Court can rule for them without reversing itself by imposing an implied obligation to publish only in the "circumstances of 2013," rather than "in all circumstances."  (Pls.' Br. 48, 50 n.18.)  But Plaintiffs cannot ignore the Court's prior rulings.  *Aurelius I* and *II* clearly held that there was no such obligation in discussing Reference Year 2013.  *Aurelius I*, 2020 WL 70348, at *7 n.7; *Aurelius II*, 2021 WL 1177465, at *3.  Under Local Rule 6.3, Plaintiffs had 14 days to move to reconsider those decisions.  They did not.  Under the law of the case doctrine, those decisions are "binding precedent to be followed in subsequent stages of the same litigation."  *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991).

3.    The Court's decisions in *Aurelius I* and *II* were also correct, because Plaintiffs do not come close to meeting their "heavy burden" under New York law to establish "the existence of an implied-in-fact covenant" to publish GDP concurrently in two base years under *any* circumstances.  *Rowe* v. *Great Atl. & Pac. Tea Co.*, 385 N.E.2d 566, 570 (N.Y. 1978); *ACE Sec. Corp.* v. *DB Structured Prod., Inc.*, 36 N.E.3d 623, 630 (N.Y. 2015) (New York courts are "extremely reluctant to interpret an agreement as impliedly stating something").  Plaintiffs' invocation of the implied covenant of good faith and fair dealing adds nothing: the covenant "'does

not add[ ] to the contract a substantive provision not included by the parties.'" *Gun Hill Rd. Serv. Station, Inc.* v. *ExxonMobil Oil Corp.*, 2013 WL 395096, at *8 (S.D.N.Y. Feb. 1, 2013) (quoting *Broder* v. *Cablevision Sys. Corp.*, 418 F.3d 187, 199 (2d Cir. 2005)); *see also Compania Embotelladora Del Pacifico, S.A.* v. *Pepsi Cola Co.*, 976 F.3d 239, 248 (2d Cir. 2020) ("[T]he covenant of good faith and fair dealing does not give rise to new, affirmative duties on contracting parties.").

4.     Throughout their brief (Pls.' Br. 2-3, 27-33, 35-40, 44, 50, 56, 62, 84), Plaintiffs invoke the decision of the English court in *Palladian*. But that decision—which applied *English* law, is full of errors (*see* §§ III.D.2-3, *infra*), and is subject to appeal—rested on the premise that, contrary to New York law and this Court's rulings, there *was* an implied term requiring publication of Actual Real GDP in the 1993 base year.  Indeed, the English court ordered the Republic to publish real GDP in 1993 base through 2034.  (Arg. Ex. 178 (Palladian Judgment) ¶¶ 266-271.)  The English court reasoned, also contrary to New York law and this Court's prior rulings, that "the fact that there is no express term dealing with publication is not a reason to conclude that the [Variable Factor Approach] is wrong."  (*Id.* ¶ 229.)  The English court also allowed Claimants, contrary to New York law and this Court's rulings, to estimate Actual Real GDP in 2013 prices "us[ing] the EMAE data."  (*Id.* ¶ 253.)

### 2.    With No Evidence of Bad Faith, Plaintiffs Cannot Prove a Breach of the Implied Covenant.

Plaintiffs also try to dilute the burden of proof on their implied covenant claim by claiming that they need show only that the Republic's actions had "the effect" of harming their contractual rights, *irrespective* of whether the Republic acted in bad faith. (Pls.' Br. 46, 54.)  Plaintiffs are wrong, as the Court already recognized:  their claim requires evidence that the Republic acted wrongfully "by rebasing in a manner *deliberately designed* to avoid making a payment under the Global Security." *Aurelius I*, 2020 WL 70348, at *7 at n.7 (emphasis added); *see also Aurelius II*, 2021 WL 1177465, at *11 (allowing implied covenant claim to proceed on allegation "that the Republic caused INDEC to stop publishing data to obscure the fact that a payment was due so as to prevent having to make payment to bondholders").

1.    To prove a breach of the implied covenant of good faith and fair dealing, Plaintiffs must come forward with evidence of *bad faith*. (*See* Arg. Br. 32-33.)  "Under New York law, a defendant violates the implied covenant when it *purposefully sabotages* a plaintiff's ability to benefit under the contract," whereas "intentional acts done without the purpose of cheating the plaintiff" are insufficient. *Thompson* v. *Advanced Armament Corp., LLC*, 614 F. App'x 523, 525 (2d Cir. 2015) (emphasis added); *Wagner* v. *JP Morgan Chase Bank*, 2011 WL 856262 at *4 (S.D.N.Y. Mar. 9, 2011) ("[A] defendant violates the covenant of good faith and fair dealing only when he acts with some improper motive.").  "[T]here is a presumption

that all parties act in good faith," *Tractebel Energy Mktg., Inc.* v. *AEP Power Mktg., Inc.*, 487 F.3d 89, 98 (2d Cir. 2007), and therefore the implied covenant "will be breached only in a narrow range of cases," *Security Plans, Inc.* v. *CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014).

2.    Plaintiffs' cases (Pls.' Br. 48-49) do not support their position. Most have to do with Plaintiffs' pleading burden.[9] But even these cases make clear that the non-provision of information, standing alone, does not breach the implied covenant. Plaintiffs must show that the Republic "*refused* to disclose information" and did so "'*purposefully*' and '*in bad faith.*'" *Melling*, 2019 WL 235641, at *6 (emphasis added); *Hexagon*, 2014 WL 1303516, at *5 (defendant "*intentionally* avoided informing" plaintiff of key information) (emphasis added); *Rosen*, 2021 WL 4523713, at *7 ("Defendants not only 'failed to advise' Plaintiff of this 'critical development,' but also *thwarted his attempts to learn of it*.") (emphasis added).[10]

---

[9] *Melling* v. *Hamilton Point Investments, LLC*, 2019 WL 235641, at *2 (E.D.N.Y. Jan. 16, 2019) (12(b)(6) ruling); *Hexagon Securities LLC* v. *Leawood Bancshares, Inc.*, 2014 WL 1303516, at *1 (S.D.N.Y. Mar. 14, 2014) (same); *Rosen* v. *Sapir*, 2021 WL 4523713, at *4 (S.D.N.Y. Sept. 30, 2021) (same); *Zakrzewski* v. *Luxoft USA, Inc.*, 151 A.D.3d 573 (1st Dep't 2017) (affirming denial of motion to dismiss).

[10] In Plaintiffs' other cases, the defendant refused to provide information the plaintiff needed to perform under the contract. *Zakrzewski*, 151 A.D.3d at 574 ("defendant failed to set goals" plaintiff had to meet to earn stock); *H/R Stone, Inc.* v. *Phoenix Bus. Sys., Inc.*, 660 F. Supp. 351, 359 (S.D.N.Y. 1987) (plaintiff "refus[ed] to provide . . . the formula" defendants had to use). But "[h]ere, Plaintiffs do not allege that any action taken by the Republic prevented <u>Plaintiffs</u>' performance." *Aurelius II*, 2021 WL 1177465, at *11 (emphasis in original).

### 3. Plaintiffs Point to No Admissible Evidence Creating a Triable Issue as to the Republic's Good Faith.

When it comes to the core allegation that got Plaintiffs past the motion to dismiss stage—that the Republic "sought to deprive Plaintiffs of payment for the 2013 Reference Year by causing INDEC not to publish the data necessary to make such a calculation," *Aurelius II*, 2021 WL 1177465, at *11—Plaintiffs have little to say. Plaintiffs do not grapple with the undisputed facts affirmatively showing that INDEC's rebasing and publication decisions had nothing to do with the GDP-linked securities *at all*. (*Infra* § II.A.3.a.) Instead, Plaintiffs rely on pure speculation about events at INDEC (Pls.' Br. 53-58; *infra* § II.A.3.b) and incorrect assertions about what the Republic could have caused INDEC to do, rather than what actually happened (Pls.' Br. 41-44; *infra* § II.A.3.c). But this is not enough to carry Plaintiffs' burden on this motion of identifying "specific facts showing that there is a genuine issue for trial." *Caldarola* v. *Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002).

#### a) INDEC's Decision Not to Publish Outdated GDP Was Unrelated to the Securities.

Plaintiffs are unable to dispute the significant body of evidence that INDEC's rebasing process, which began in 2005 and was completed in 2014, was undertaken pursuant to international standards and in response to intense IMF pressure. (Arg. Br. 15-17, 33-36.) Nor do Plaintiffs grapple with facts demonstrating that the Republic's discontinuation of the 1993 base year was done entirely in good faith,

and in no way for the purpose of avoiding a payment under the GDP-linked securities.  The undisputed facts show that:

- ***International standards*** dictate that countries rebase their GDP every five to ten years to maintain accuracy in GDP measurements, as "the prices of the [old] base year become increasingly irrelevant."  (Pls.' Resp. SOF ¶ 81; *see* Arg. Br. 16, 34-35.)  Plaintiffs are unable to identify a single country in the history of the world that has ever continued to publish real GDP in an old base year after a rebasing.[11]  (Pls.' Resp. SOF ¶ 134.)

- ***The accuracy of the Republic's outdated national statistics was in doubt.*** The IMF, private analysts, and Plaintiffs themselves recognized that the 1993 base year ***was inaccurate*** and that the rebasing was necessary.  (Arg. Br. 16, 22 n.9.)  Plaintiffs' only response is that "the Republic challenged private GDP estimates" as too low.  (Pls.' Resp. SOF ¶¶ 97, 123-126.)  This does not change the broad consensus that rebasing was necessary.  (*Id.* ¶¶ 123, 124.)

- "***[T]he IMF was pressuring the Republic to rebase***"—as Plaintiffs flatly concede in their brief.  (Pls.' Br. 26.)  This "pressure" culminated in a March 2014 IMF-imposed deadline backed by the threat of economically devastating sanctions.  (Arg. Br. 16-17.)  Plaintiffs say that the IMF "never told Argentina to stop publishing figures measured in constant 1993 prices."  (Pls.' Br. 26.) This is neither here nor there.  The point is that the ***decision to rebase and the timing of that rebasing*** were strongly influenced by IMF pressure.

---

[11] Plaintiffs instead point to a U.S. and a U.K. government statistic that they contend "were outdated" and yet "continued [to be] published."  (Pls.' Br. 24-25.)  But neither of those examples are "GDP" or "outdated."  (Arg. Supp. SOF ¶¶ 52-59.)

- INDEC automatically stopped producing the 1993 base year in connection with the rebasing. INDEC's Director of National Accounts, Gustavo Rodríguez, testified that INDEC "did not even discuss the possibility of publishing fourth quarter data in 1993 prices," much less receive any kind of directive not to do so. (Arg. Ex. 5 (Rodríguez First Statement) ¶ 45; Arg. SOF ¶¶ 132, 135.) INDEC did not publish that data because doing so would have made no sense—and it also was "simply not possible to conduct two parallel GDP calculations" given INDEC's resource and time constraints. (Arg. Ex. 5 (Rodríguez First Statement) ¶ 43.)[12]

The record thus flatly refutes Plaintiffs' allegation that the Republic "inappropriately us[ed] the rebasing *as an excuse* to stop publishing Actual Real GDP in 1993 prices." (Aurelius AC ¶ 63 (emphasis added).) Rather, the undisputed facts show that INDEC's actions surrounding the rebasing were motivated by "a genuine and colorable business justification," which is consistent with the obligation to act in good faith. *Lykins* v. *IMPCO Techs., Inc.*, 2018 WL 3231542, at *11 (S.D.N.Y. Mar. 6, 2018) (collecting cases).

---

[12] Plaintiffs' assertion that "the Republic told investors at roadshow presentations in 2005 that it would produce the statistics necessary" for the Securities (Pls.' Br. 48) has nothing to do with their breach-of-covenant claim. Moreover, the Republic assured investors that it would continue publishing real GDP—which it has done— not real GDP in a particular base year. (Arg. Resp. SOF ¶¶ 63-70.)

        **b)**     *Plaintiffs' Citations to Bits of the Record Do Not Create*
            *a Triable Issue on the Republic's Alleged Bad Faith.*

To try to show bad faith, Plaintiffs point to miscellaneous fragments of the record in their effort to show that the Republic "sought to deprive Plaintiffs of payment for the 2013 Reference Year by causing INDEC not to publish the data necessary to make such a calculation." *Aurelius II*, 2021 WL 1177465, at *11. Plaintiffs "may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment, but instead "must offer some hard evidence showing that [their] version of the events is not wholly fanciful." *Jeffreys* v. *City of New York*, 426 F.3d 549, 554 (2d Cir. 2005); *see also Bickerstaff* v. *Vassar College*, 196 F.3d 435, 452 (2d Cir. 1999) ("Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment."). They have no such evidence.

       **1.**     ***The Ministry of Economy "Following" INDEC Data Releases and Monitoring the Republic's Payment Obligations***.  Plaintiffs ask the Court to infer that a conspiracy existed between the Ministry of Economy and INDEC on the basis of documents demonstrating that the Ministry paid attention to economic statistics published by INDEC.  (Pls.' Br. 52-53.)  But the record shows that the Ministry of Economy quite naturally relied upon INDEC's statistical releases for a wide variety of reasons, including to devise public policies and prepare budget allocations.  (*E.g.*, Pls. Ex. 160 (April 2014 ONCP Budget Analysis).)  The September 27, 2013 email

that Plaintiffs cite as evidence of "an alarm at" the Ministry in relation to the Securities is simply a message about the circumstances under which payment would be required for the following year.  (Pls.' Br. 52; Pls.' Ex. 123.)  There is *nothing* in that email—or any others that Plaintiffs cite—suggesting that the Ministry of Economy engaged in any wrongful course of conduct with respect to the Securities.

  **2.**  ***Statements by the Minister of Economy and Chief of Cabinet****.* Plaintiffs also point to (1) the Minister of Economy, Axel Kicillof, taking part in a March 27, 2014 press conference with INDEC to announce the new 2004 GDP price series (Pls.' Br. 17, 55), and (2) April 3, 2014 remarks to the Argentine Congress by Jorge Capitanich, the Republic's Chief of Cabinet.  (Pls.' Br. at 20-21.)  These are not probative of anything resembling bad faith on the part of the Republic.  In the case of Mr. Kicillof, he clearly stated that the change in base year "is the work that *the Institute* has done" (*i.e.* INDEC).  (Arg. Ex. 95 (Press Conference Tr.) 4 (emphasis added)*.*)  Mr. Kicillof said nothing about whether the Securities would be paid; he merely clarified that the 2004 base series would be used in the calculations. (*Id.*)  It is also clear why the Minister of Economy would be involved in a March 2014 press conference announcing the new base year:  The Ministry of Economy manages relations with the IMF, which had mandated that the Republic release the rebased GDP figures by March 31, 2014.  (Arg. Ex. 86 (Dec. 9, 2013 Rule K-1 Report - Decision) at -0312; Arg. SOF ¶¶ 112-119; 128-131.)

In the case of the Chief of Cabinet, Mr. Capitanich was responding to a question from a member of Congress about Guillermo Nielsen's and Gabriel Rubinstein's article in the magazine *La Nación*, published days earlier, which argued that a payment was due for Reference Year 2013.[13]  (Arg. Ex. 120 (March 31, 2014 *La Nación* article.)  Mr. Capitanich gave his opinion that the article was wrong and he did not believe a payment would be due, which was consistent with the consensus view of market analysts (and many Plaintiffs) in March and April 2014.  (SOF ¶¶ 167-171.)  Nothing in Mr. Capitanich's answer suggests the Ministry of Economy's involvement in the already-concluded rebasing, much less any bad faith.

**3.** ***The Adoption of the Constant Factor Approach***.  Plaintiffs contend that the Ministry of Economy "concocted an alternative 'constant' adjustment fraction approach based on the Republic's self-serving vision of the 'logic' and 'spirit' of the contract."  (Pls.' Br. 55.)  Plaintiffs' argument presupposes not only that their interpretation of the Global Security is correct (it is not), but that it is the only reasonable interpretation.  Tellingly, however, the record is clear that no one believed, at the time the Securities were issued, that the Republic would be obliged

---

[13] Nielsen testified that the *La Nación* article was written hastily based on limited information, and that the results of the approach discussed in the article ran contrary to his view from 2005 that "[p]ayments were only supposed to be made if the economy was growing at or above 3 percent (depending on the year)."  (Arg. Ex. 2 (Nielsen Statement) ¶¶ 35-36.)

to pay if its economy was growing at a rate below 3%.  (Arg. Br. 42-43; Arg. SOF ¶¶ 63, 123, 162, 168-176.)

Consistent with that understanding, when the Ministry of Economy analyzed whether payment would be due under the Securities *two years before the rebasing*, it applied the Constant Factor Approach.  (Arg. SOF ¶¶ 143-149.)  Market observers in 2014 also understood the Securities to require the Constant Factor Approach. (Arg. SOF ¶¶ 167-170; Arg. Br. 19-20, 42-43.)  None of this can be squared with Plaintiffs' invention that the interpretation was "concocted" to deny them payment.

### 4.     *The April 7, 2014 Meeting Between Wright and Rodríguez*.  Plaintiffs
claim that an April 7, 2014 meeting between a Ministry of Economy official (Santiago Wright) and an INDEC official (Gustavo Rodríguez) supports an inference of a bad faith conspiracy to deny payment.  (Pls.' Br. 22-23, 56-57.)  Plaintiffs assert that during this "unprecedented meeting," Wright "explained [the Ministry]'s constant fraction alternative" and conveyed a "message that [the Ministry] did not need or want INDEC to publish 2013 Actual Real GDP measured in constant 1993 prices" to INDEC.  (*Id.* at 56-57.)

There is no evidence to support Plaintiffs' speculation.  *See Kulak* v. *City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) ("[C]onclusory statements, conjecture, or speculation . . . will not defeat summary judgment.").  For starters, the cessation of the 1993 series had already occurred before this meeting.  (Arg. Ex. 88 (March 27,

2014 INDEC Announcement).)   Both Mr. Wright and Mr. Rodríguez submitted sworn declarations, were deposed, and were cross-examined at trial.  Their testimony about the April 7, 2014 meeting was clear and consistent:  Mr. Wright sought to "delve deeper into the implications of the base change" (Pls.' Ex. 159), namely by seeking Mr. Rodríguez's input "as a national accounts expert and a statistician on whether there was a reasonable statistical criteria which might inform the choice of the [overlap] year."  (Arg. Ex. 114 (Wright Witness Statement) ¶ 26; Arg. Ex. 222 (Wright Dep. Tr. and associated errata) 88:2-12.)  Mr. Rodríguez confirmed that they discussed "which . . . sets of data for each year more faithfully reflected the GDP growth."  (Arg. Ex. 221 (Rodríguez Dep. Tr.) 38:23-25.)

INDEC and Ministry of Economy witnesses likewise confirmed that there was no attempt by the Ministry to pressure INDEC, noting that "before the rebasing" no one "at the Ministry of Economy communicate[d] with anyone at INDEC" about the rebasing or Adjustment Provision.  (Arg. Ex. 222 (Wright Dep. Tr.) 71:10-72:17; *see also* Arg. Ex. 221 (Rodríguez Dep. Tr. and associated errata) 85:13-22, 86:4-21; Arg. Ex. 113 (Casillas Dep. Tr.) 78:14-20 ("I did not become aware of anything in particular before [INDEC] actually did it").)

Plaintiffs point to no documents in the record that contradict either Mr. Wright's or Mr. Rodríguez's accounts.  Plaintiffs' speculation that INDEC and the Ministry of Economy were conspiring against them does not create a triable issue

in the face of uncontradicted testimony.  *See Wilder* v. *World of Boxing LLC*, 310 F. Supp. 3d 426, 451 (S.D.N.Y. 2018), *aff'd*, 777 F. App'x 531 (2d Cir. 2019) (granting summary judgment where "allegations of bad faith amount to nothing more than speculation and conjecture").

     **5.**    *April 2014 Spreadsheets*.  Finally, Plaintiffs contend that, after Nielsen and Rubinstein's article appeared, INDEC performed an "analysis [to] confirm[] what Nielsen and Rubinstein had said," and then, after Mr. Wright's meeting with Mr. Rodríguez, "INDEC personnel revised their internal analysis to reflect [the Ministry of Economy]'s constant fraction approach."  (Pls.' Br. 52, 57.)  Plaintiffs cite to two spreadsheets that show various applications of the Adjustment Provision to support their theory.  (Pls.' SOF ¶¶ 129, 159.)  Both documents have metadata attributing them to a single INDEC employee, Luis Suárez.  (Pls.' Exs. 79, 80.)

     Mr. Suárez, however, testified that he was not involved in the rebasing in *any* capacity or in making calculations under the Securities.  He explained that "since 2008, I wasn't in National Accounts," the part of INDEC that calculates GDP, and "didn't do any calculation" related to GDP in 2014.  (Arg. Ex. 182 (Suárez Hague Tr.) 31:7-11; *see also id.* 17:16-24, 18:8-12, 20:12-21:3.)  Mr. Suárez also confirmed that INDEC had no role in adjusting Base Case GDP under the Securities.  (*Id.* at 34:1-15 (noting "INDEC doesn't solve that").)  But Mr. Suárez does appear to have been involved in an academic course that touched on the Securities.  On April 3,

2014—the same day he saved one of the spreadsheets relied on by Plaintiffs—Mr. Suárez also saved a set of "Yahoo Group Archives" referring to class discussions about the Securities.  (Arg. Ex. 207 (Archivos Del Grupo Yahoo) ("I have discussed it in class.  I'm waiting for any comments on it.  If there aren't any, I will upload it as is.").)  Whatever their purpose, Mr. Suárez's two spreadsheets are not evidence of any "analysis" *on the part of INDEC* concerning the Securities.

*      *      *

To create any triable issue of fact, Plaintiffs would need this Court to find that the 13 fact witnesses they deposed from the Republic consistently lied.  Yet Plaintiffs can point to no "hard evidence" supporting their theory of bad faith.  *Jeffreys*, 426 F.3d at 554; *DeFabio* v. *E. Hampton Union Free Sch. Dist.*, 623 F.3d 71, 81 (2d Cir. 2010) (a triable issue of fact "is not created by a mere allegation in the pleadings, nor by surmise or conjecture on the part of the litigants").

### c)      It Is Irrelevant That INDEC Is Part of the Argentine Government.

Plaintiffs' contention the Republic *could* have interfered with INDEC's technical decision-making to compel INDEC to produce Real GDP for 2013 in 1993 base prices (Pls.' Br. 41-44, 53)—even if accepted—would not establish a breach of the implied covenant.  Whether the Republic *could* have exerted influence over INDEC's publication of specific data is beside the point; the relevant question is whether "the Republic <u>in fact</u> caused INDEC to refrain from publishing data in this

-36-

instance." *Aurelius II*, 2021 WL 1177465, at *12 n.14 (emphasis in original).  There is no evidence to support such a claim.  (*See supra* §§ II.A.3.a-b.)

In any event, Plaintiffs' theory that the Republic could have required INDEC to publish in the 1993 base is incorrect.  As the Republic's expert Prof. Julio Pablo Comadira, one of the foremost authorities on Argentine administrative law (*see* Arg. Ex. 183 (Comadira CV)), has explained:  Argentine law does not allow "superior bod[ies]," like the Ministry of Economy or Presidency, to exercise control over INDEC's specific "technical competences exclusively attributed to it by law," including "what methodology it should use to perform and/or publish its statistics, and, in particular, to use a specific base year . . . in calculating Argentina's real GDP."  (Arg. Ex. 179 (Comadira Rebuttal Report) ¶¶ 29-30, 34-36, 43-44, 67 n.90.)[14]

In arguing otherwise, Plaintiffs rely heavily on their expert Prof. Bianchi (*see* Pls.' Br. 41, 43; Pls.' SOF ¶¶ 54, 56-61, 204-208), but his opinion is incorrect as a

---

[14] Plaintiffs' citation to two district court cases applying U.S personal jurisdiction principles—one nearly 50 years old—goes nowhere in light of these Argentine legal constraints.  (Pls.' Br. 42 (citing *WG Sec. Prod., Inc.* v. *Tyco Int'l Ltd.*, 2006 WL 5671239, at *4 (C.D. Cal. Mar. 6, 2006) (discussing "specific jurisdiction"); *PPS, Inc.* v. *Jewelry Sales Representatives, Inc.*, 392 F. Supp. 375, 378 (S.D.N.Y. 1975) ("amenability to jurisdiction")).)

matter of Argentine law.[15]  Bianchi claims that the President of the Republic could have invoked Article 99(17) of the Argentine National Constitution to "request [a] report[]" from INDEC concerning what the hypothetical real GDP figures would have been in the 1993 year of base prices.  (Pls.' Br. 43-44.)  ███████████

███████████████████████████████████████████████

███████████████████  (*See* Arg. Ex. 185 (Bianchi Dep. Tr.) 149:7-152:20.)  As Prof. Comadira explains, this constitutional power does not apply here, because it does not extend to causing an agency to generate *new information* or instructing an agency in performing its technical work.  (Arg. Ex. 179 (Comadira Rebuttal Report) ¶¶ 64, 66-67 & n.90.)[16]  The undisputed facts are that INDEC did not have the data necessary to calculate real GDP in 1993 base.  (Arg. Supp. SOF ¶ 60.)  In any event, a hypothetical report would not have helped Plaintiffs, because it would not constitute "the gross domestic product of Argentina . . . as published" by

---

[15] Bianchi has testified against the Republic at least 17 times (*see* Ex. 184 (Bianchi CV) at 6-7; Ex. 185 (Bianchi Dep. Tr. 28:6-17)) and, respectfully, is not a credible expositor of Argentine law.

[16] Plaintiffs' assertion that the Republic "[c]ontradict[ed]" this position in the English proceedings is wrong.  (Pls.' Br. 44.)  In discussing specific performance, the Republic's barrister merely stated that "[i]f it is [the court's] decision that they have to do it, then they have to do it."  (Arg. Ex. 178 (Palladian Judgment) ¶ 231.)  Stating that INDEC would obey a court order is not an assurance that the President could have lawfully ordered INDEC to publish real GDP in 1993 base.

INDEC, as the Global Security requires.  (Arg. Ex. 37  (2005 Global Security) R-2;

*see also* Arg. Ex. 179 (Comadira Rebuttal Report) ¶ 65 & n.90.)

## B. There Is No Triable Issue of Fact Under Plaintiffs' Prevention Theory.

Plaintiffs argue that, under the prevention doctrine, they need only prove that

the Republic "prevent[ed] the occurrence of a condition precedent" by "fail[ing] to

publish 2013 Actual Real GDP measured in constant 1993 prices."  (Pls.' Br. 59.)

Plaintiffs are wrong.

1. The prevention doctrine does not fit the facts of Plaintiffs' claim.  In

*Aurelius II*, the Court was rightfully skeptical of Plaintiffs' suggestion that the

prevention doctrine "is applicable here."  *Aurelius II*, 2021 WL 1177465, at *10.  As

the Court pointed out, the prevention doctrine typically applies "where the party

invoking the doctrine argued its contract counterparty had prevented the invoking

party's performance" or "where a party prevented the occurrence of a condition

precedent to formation of a binding contract."  *Id.*  Neither scenario applies to these

cases.  "Plaintiffs do not allege that any action taken by the Republic prevented

<u>Plaintiffs</u>' performance, nor do they allege that the Republic prevented the

occurrence of a condition precedent to the formation of a contract."  *Id.* at *11.

2. Plaintiffs' theory—that the Republic's "failure to publish 2013 Actual

Real GDP measured in constant 1993 prices[] had the effect of destroying Plaintiffs'

right to receive payment for 2013" (Pls.' Br. 59)—also fails because it requires the

Court to impose an implied obligation on the Republic to publish GDP in the 1993 base.  The Court has already refused to do this.  (*See* § II.A.1, *supra*.)  In addition, as with the duty of good faith and fair dealing, the prevention doctrine cannot be used to create implied contractual terms.  The doctrine "does not imply a promise that the condition will occur, let alone a promise to use best efforts to fulfill the condition"; nor does it "obligate a party to take affirmative steps that are clearly not required by the contract." 13 Williston on Contracts § 38:15 (4th ed.).

3.     Plaintiffs' prevention theory also fails because it requires proof of "wrongful" conduct, which, as set forth above, Plaintiffs do not have.  (*See* § II.A.3, *supra*.)  As the Court explained in *Aurelius II*, "[t]he doctrine applies 'when a party <u>wrongfully</u> prevents [a] condition from occurring.'" *Aurelius II*, 2021 WL 1177465, at *10 (quoting *Grewal* v. *Cuneo Gilbert & LaDuca LLP*, 2018 WL 4682013, at *11 (S.D.N.Y. Sept. 28, 2018), *aff'd*, 803 F. App'x 457 (2d Cir. 2020)); *see also Ixe Banco, S.A.* v. *MBNA Am. Bank, N.A.*, 2009 WL 3124219, at *4 (S.D.N.Y. Sept. 29, 2009) (Preska, J.) (explaining that "wrongful" conduct may be "arbitrary," made in "bad faith," or otherwise "deliberate[]" and aimed at "frustrat[ing]" the contract).[17]

---

[17] *See also Kabaru Corp.* v. *PBGC*, 1997 WL 759462, at *10 (S.D.N.Y. Dec. 10, 1997) ("prevention doctrine" requires that defendant "act wrongfully"); *O.F.I. Imports Inc.* v. *Gen. Elec. Cap. Corp.*, 2017 WL 6734187, at *3 (S.D.N.Y. Dec. 29, 2017) ("When it applies, the prevention doctrine requires a party to refrain from exercising a contractual right in 'bad faith—arbitrarily, irrationally or malevolently.'"); *MCI LLC* v. *Rutgers Cas. Ins. Co.*, 2007 WL 4258190, at *10 (S.D.N.Y. Dec. 4, 2007) (the "cornerstone" of the prevention doctrine is that "a party

*Stern* v. *Gepo Realty Corp.*, 45 N.E.2d 440 (N.Y. 1942) (Pls.' Br. 60) does not help Plaintiffs.  The Court of Appeals in *Stern* sustained the plaintiff's claim under the prevention doctrine because he had alleged that the defendant acted *wrongfully*.  As the Court observed, "[a] vendor of real property is under a *duty to take affirmative action* to convey a marketable title according to his contract of sale" including "undertak[ing] to pay off items which are concededly liens upon the property."  *Stern*, 45 N.E.2d at 441 (emphasis added).  Therefore, the plaintiff's allegation "that title did not close because of the [defendants'] neglect and *refusal* to discharge liens against the property" was sufficient to state a claim under the prevention doctrine and defeat defendant's motion for judgment on the pleadings. *Id.  Stern* thus confirms that, to prevail under the prevention doctrine, Plaintiffs must present evidence of the Republic's "wrongful[]" acts.

### C.    Plaintiffs Abandon Their Theory That the Republic "Modified" the Global Security by Failing to Apply the Adjustment Fraction.

In their operative complaints, Plaintiffs allege that the Republic breached Section 22 of the Global Security (*i.e.*, the Modification Provision) because it "did not apply the adjustment fraction to Base Case GDP, and did not use adjusted Base Case GDP to calculate Base Case GDP Growth."  (ACP Master AC ¶ 68; *see also*

---

must prevent the occurrence of the condition in bad faith or wrongfully"); *Spanos* v. *Skouras Theatres Corp.*, 364 F.2d 161, 169 (2d Cir. 1966) (under the prevention doctrine, a party is not "permitted to take advantage of his own *wrong*" or "*unjustly* prevent[] the performance or the happening of a condition" (emphasis added)).

Aurelius AC ¶ 68; Adona SAC ¶ 66; Novoriver AC ¶ 79; Ape Group Compl. ¶ 32; 683 Capital AC ¶ 123.)  This Court allowed Plaintiffs to proceed to discovery based on this factual allegation.  *Aurelius II*, 2021 WL 1177465, at *9 ("Plaintiffs have alleged that the Republic . . . us[ed] unadjusted figures to calculate the Payment Amount for the 2013 Reference Year.").

Plaintiffs now do not dispute (Pls.' Br. 23) that the Ministry of Economy *did* apply the Adjustment Provision in concluding that no payment was due for Reference Year 2013 (*see* Arg. Br. 37-39; Pls.' Resp. SOF ¶¶ 180-183 (accepting that the Ministry of Economy used "an application of the Adjustment Provision" in the determination)).  Indeed, the record includes the Ministry of Economy's detailed analysis concerning how to apply the Adjustment Provision.  (*See id.*; *supra* 32-33.)  Plaintiffs thus pivot to a new theory:  "the Republic breached the Modifications Provision by applying *its own version of the adjustment fraction* rather than complying with the contractual terms." (Pls.' Br. 45 (emphasis added).) But Plaintiffs "cannot now amend their complaint merely by raising new facts or theories in their briefs" during summary judgment.  *See SEC* v. *Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 531 (S.D.N.Y. 2018).  "It is black letter law that a party may not raise new claims for the first time in opposition to summary judgment." *Brandon* v. *City of N.Y.*, 705 F. Supp. 2d 261, 278 (S.D.N.Y. 2010) (Preska, J.). Plaintiffs' "modifications" theory fails for this reason alone.

Even if this Court were to consider Plaintiffs' new breach of the Modifications Provision theory, it would still fail. A good-faith interpretation and application of the Adjustment Provision by the Republic is not a "modification, amendment, supplement, request, demand, authorization, direction, notice, consent, [or] waiver" of the "terms and conditions of the GDP-Linked Securities" that would have to be run through the process for amending the Global Security set forth in the Modifications clause. (Arg. Ex. 37 (2005 Global Security) § 22(a).) There is no reference in the clause to seeking approval for an "interpretation."

To the contrary, absent "bad faith, willful misconduct or manifest error," the Global Security affords the Republic discretion to make "[a]ll calculations necessary to determine" Excess GDP and the Payment Amount, which include calculations under the Adjustment Provision. (Arg. Ex. 37 (2005 Global Security) at R-3, R-4; Arg. Br. 39 n.21.) Plaintiffs fail even to address this point because they cannot; there is no evidence of bad faith, deliberate wrongdoing, or clear error by the Ministry of Economy that could undo the Republic's calculations. (*Supra* § II.A.3.) In any event, the Republic *did* correctly apply the Adjustment Fraction in concluding that no payment was due for Reference Year 2013, as discussed immediately below.

III.   **THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE REPUBLIC OR, AT A MINIMUM, DENY PLAINTIFFS' MOTION BECAUSE PLAINTIFFS MISINTERPRET THE GLOBAL SECURITY.**

Though the Court need not reach the issue because Plaintiffs have failed to produce any evidence in support of the claims that survived *Aurelius I* and *II* (*see* § II, *supra*), the Court should also grant summary judgment to the Republic because Plaintiffs' interpretation of the Adjustment Provision is incorrect.  The language of the Adjustment Provision—and the Global Security as a whole—calls for a constant factor to re-scale the target levels of Base Case GDP upon a rebasing.  Although Plaintiffs insist that their Variable Factor interpretation is the "clear and unambiguous" reading (*e.g.*, Pls.' Br. 33), they have no more to offer than repeated references to the words "each" and "such" and regurgitating the English court's erroneous conclusions, unsupported by record evidence or their own experts' opinions.  At best for Plaintiffs the Adjustment Provision is ambiguous, in which case the Court should deny Plaintiffs' motion (but still grant the Republic's for the reasons set forth in Sections I and II, *supra*).

*First*, Plaintiffs have no evidence that calls into question the Republic's clear showing that the Global Security was only intended to pay out if Argentina's Actual Real GDP was growing by 3%, which is only achieved by the Constant Factor Approach.  (*Infra* III.A.)  *Second*, Plaintiffs mostly ignore the many textual features that compel the Constant Factor Approach—including the absence of any express or

implied requirement for INDEC to continue publishing GDP in 1993 base for the life of the securities. (*Infra* III.B.) *Third*, Plaintiffs do not even try to dispute that their Variable Factor Approach renders the Adjustment Provision superfluous. (*Infra* III.C.) *Finally*, even Plaintiffs' attempts to argue that Plaintiffs' interpretation "does not produce absurd results"—a low bar—fall short of the mark. (*Infra* III.D.)

### A.    The Adjustment Provision Must Be Read in Light of the Intended Operation of the Global Security.

A proper interpretation of the Global Security requires looking at the full context in which these Securities were issued, that is "the entire situation, as it appeared to the parties." Restatement (Second) of Contracts § 202 cmt. b (1981); *accord In re Coudert Bros*., 487 B.R. 375, 393 (S.D.N.Y. 2013). The Republic's Opening Brief and Statement of Undisputed Facts canvassed extensive and undisputed record evidence that Argentina's long-term potential GDP growth rate of 3%—independent of any particular year of base prices—was the fundamental premise of the Base Case GDP Growth condition in the Global Security (and how the Base Case GDP levels were calculated). (*See* Arg. Br. 10-11, 19-20, 42-43; Arg. SOF ¶¶ 14-25, 59-63, 168-175.) There is no dispute, for example that:

- The Republic's June 2004 SEC filing describing the terms of the GDP-linked Securities for the 2005 Exchange Offer also described a 3% growth rate as the "Payment trigger." (Arg. Ex. 18 (June 10, 2004 Form 18-K/A) at -0163);

- Investor presentations explained that the Securities were designed around a projected 3% long-term growth condition without reference to a particular base year, and that is how analysts and investors understood the Securities, *including Plaintiffs*. (Arg. SOF ¶¶ 21-25, 63, 168-174);

- The 3% growth rate did not come out of nowhere; it was calculated based on a detailed debt sustainability analysis that sought to measure an achievable level of long-term growth for the Argentine economy based on its historical performance across multiple base years (SOF ¶¶ 14-15, 62)—an analysis that Morgan Stanley, for example, replicated, calculating 3.3% as the mean growth rate over the "last 100 years" (Ex. 27 at 6; SOF ¶¶ 63, 123, 168-170 (cataloguing other analyst and investor commentary understanding that payment would be triggered only if the economy grew at or above 3%)).

It is therefore unsurprising—but extremely telling—that Plaintiffs have been unable to identify *a single investor* who, at the time of the Securities' issuance, understood the Adjustment Provision to modify the 3% Base Case GDP Growth rate in the event of a rebasing in the way Plaintiffs now claim. (*See* Arg. Br. 42-43; Pls.' Resp. SOF ¶ 176; Arg. SOF ¶¶ 172-176.)   And when Plaintiffs' Variable Factor Approach first surfaced years later, market analysts described it as an "alternative interpretation" to the Constant Factor Approach, which was considered the "mainstream interpretation." (Arg. Ex. 131 (April 1, 2014 HSBC Report) -0379; *see also* Arg. Ex. 132 (April 8, 2014 Bank of America Report) -0161.)

To try to get the Court to adopt an interpretation of the Global Security that no one in 2005 or 2010 believed to be correct, Plaintiffs argue that the (approximately) 3% Base Case GDP Growth in the Securities actually was "measured in constant 1993 prices"—because Base Case *GDP* was "measured in constant 1993 prices" and Base Case GDP Growth rates are a "function of Base Case GDP." (Pls.' Br. 8-9; Pls.' Resp. SOF ¶ 62.)  Anyone with a calculator can see the opposite is true:  the unrounded, otherwise seemingly random Base Case GDP figures actually follow an unmistakable pattern, increasing each year by the exact Base Case GDP Growth rate for that year (leveling out to an exactly 3% difference between them for the last 20 years in the life of the Security).  (Arg. SOF ¶¶ 14-20, 59-62; Arg. Supp. SOF ¶¶ 17-19.)  The witnesses involved in the 2005 issuance likewise confirm that the starting point for the Base Case GDP targets was the (approximately) 3% *growth* target:  "the levels [of Base Case GDP] *result from* the growth rate that we calculated" for Base Case GDP Growth—not the other way around.  (Arg. Ex. 186 (Katz U.K. Tr.) 27:9-12 (emphasis added); *see also id.* 32:11-15; Arg. Ex. 225 (Nielsen U.K. Tr.) 119:3-14 (similar); Arg. Supp. SOF ¶¶ 18-21.)  In other words, "the methodology was to determine a growth rate—a potential growth rate that Argentina considered was sustainable, and starting from the observed 2004 GDP calculated in 1993 prices applied a growth rate to generate this

table." (Arg. Ex. 186 (Katz U.K. Tr.) 27:9-16; *see also* id. 27:17-28:18, 38:4-18; Arg. Ex. 225 (Nielsen U.K. Tr.) 119:3-14; Arg. Supp. SOF ¶¶ 18-21.).[18]

Plaintiffs also argue (based on one of Mr. Katz's work papers) that the 100-year potential GDP analysis that formed the basis for Base Case GDP Growth rates was somehow tied to the 1993 base year. (Pls.' Resp. SOF ¶ 62 (citing Arg. Ex. 10).)[19] This theory, too, has no evidentiary support. (*See* Arg. Br. 9-11, 41-43; SOF ¶¶ 14-20, 60, 62; Supp. SOF ¶¶ 20-27.) Mr. Katz gave undisputed testimony to the contrary in reference to *this exact document*, explaining that the growth rates in the analysis, which covered five different base years, were calculated in "different base prices" because "to calculate the GDP in 1993 prices backwards entails a huge statistical effort that is . . . not possible." (Arg. Ex. 186 (Katz U.K. Tr.) 76:4-77:12; *see also id.* 47:13-48:16.) This is clear on the face of the document itself, which

---

[18] Plaintiffs avoid citing the English Court's erroneous conclusion that Base Case GDP Growth was tethered to 1993 base year (Arg. Ex. 178 (Palladian Judgment) ¶¶ 168, 170), likely because the testimony cited by the court (from Mr. Katz, Dr. Borensztein and Prof. Hubbard) obviously refutes its finding. As shown above, Mr. Katz expressly disagreed with this proposition. The court also misread Prof. Hubbard and Dr. Borensztein's testimony, which was about the truism that *actual* (observed) GDP growth rates are extracted from *actual* (observed) GDP, and had nothing to do with Base Case figures. (Arg. Ex. 190 (Hubbard U.K. Tr.) 16:18-18:24; Arg. Ex. 188 (Borensztein U.K. Tr.) 116:20-118:14.)

[19] The other documents Plaintiffs cite for the claim that Argentina's potential growth analysis was tied to the 1993 base year say no such thing. They report GDP (or in one instance GDP growth) in 1993 base as of 2003, 2004 or 2010, which is unsurprising since 1993 base was the only measure of GDP available in those years. (Pls.' Resp. SOF ¶ 62 (citing Arg. Exs. 21, 40; Pls.' Exs. 218, 219).)

uses (in the third column) "actual growth rates resulting from series calculated at different base year prices" including base years "1993, 1986, 1970, 1960." (Arg. Ex. 10; *see also* Arg. Ex. 186 (Katz U.K. Tr.) 76:4-11; Arg. Supp. SOF ¶¶ 22-29.) Those growth rates were used to calculate the level figures in column C (the second column), which were shown in 1993 year of base prices "only as a matter of expression" like "expressing things in dollars or in pounds." (Arg. Ex. 186 (Katz U.K. Tr.) 47:16-19; *see also id*. 60:17-22; 76:25-77:12; Arg. Supp. SOF ¶¶ 25-27.)

In light of the undisputed context for the issuance of the Securities, the Adjustment Provision must be interpreted to give effect to the parties' intent by maintaining the growth trend embedded in the Global Security. (*See* Arg. Br. 40-43; *Maxim Grp. LLC* v. *Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 303 (S.D.N.Y. 2010) (Preska, J.) (contracts must be "construed in accord with the parties' intent," and in light of "the context and circumstances surrounding the execution"); *Thompson* v. *Gjivoje*, 896 F.2d 716, 721 (2d Cir. 1990) ("giv[e] due consideration to the surrounding circumstances [and] apparent purpose which the parties sought to accomplish"); *Newmont Mines Ltd.* v. *Hanover Ins. Co.*, 784 F.2d 127, 135 (2d Cir. 1986) (contracts should be examined "in light of the business purposes sought to be achieved by the parties"); *Dreni* v. *PrinterOn Am. Corp.*, 2021 WL 4066635, at *2-3 (S.D.N.Y. Sept. 3, 2021) (interpret contracts from the perspective of "a reasonably intelligent person who has examined the context of the

entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business").)

**B.** **The Plain Text of the Global Security Compels the Constant Factor Approach.**

The plain language of the Global Security and its Adjustment Provision also confirms that the Constant Factor Approach was what was intended.  Plaintiffs' interpretation rests on two words in the contract ("each" and "such"), coupled with the plea that the phrase "such Reference Year" must be read identically throughout the Adjustment Provision, even where it serves different purposes.  (Pls.' Br. 33-36.)[20]  Stacked against that myopic analysis are numerous textual clues, both in the Adjustment Provision and throughout the Global Security, that the Variable Factor Approach is wrong and the Constant Factor Approach must apply.

*First*, read as a whole, the words of the Adjustment Provision show that it refers to a single, one-time update to the Base Case GDP table upon a base year change, not a different fraction for each year.  In full, the Provision states:

> if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Base Case GDP for each Reference Year shall be adjusted to reflect

---

[20] Plaintiffs are incorrect that the Court had a "prior reading" of the Adjustment Provision that endorsed their interpretation.  (Pls.' Br. 34.)  On the Republic's motion to dismiss, the Republic accepted Plaintiffs' allegations as true and moved to dismiss principally based on the Binding Effect Clause.  *Aurelius I*, 2020 WL 70348, at *3 n.3, *6.  While the Republic identified flaws in Plaintiffs' interpretation, the Republic did not seek dismissal based on the Constant Factor Approach.

any such change in the Year of Base Prices by multiplying the Base Case GDP for such Reference Year (as set forth in the chart above) by a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices.

(Arg. Ex. 37 at R-3.)

The heart of the Adjustment Provision is its first half—its instruction to adjust the entire Base Case GDP table *in one fell swoop* if INDEC changes its base year: "if the Year of Base Prices employed by INDEC for determining Actual Real GDP shall at any time be a calendar year other than the year 1993, ***then the Base Case GDP for <u>each</u> Reference Year shall be adjusted*** to reflect any such change in the Year of Base Prices by multiplying the Base Case GDP for <u>such</u> Reference Year (as set forth in chart above) by ***a fraction*** . . . ."  (Arg. Ex. 37 at R-3 (emphases added).) The adjustment to "each" Reference Year occurs once, "if the Year of Base Prices" changes, and uses "a fraction"—all of which is compatible only with the Constant Factor Approach, because the Variable Factor Approach can only be implemented for any given year after GDP for that whole year is published, meaning that adjustment could occur only on a repeating annual basis, and using different fractions for each year (instead of "a" fraction).  Against this clear requirement to perform a single, one-time adjustment using a single fraction, the references to "such

Reference Year" in the numerator and denominator of that fraction can only refer to the year from which the data for the fraction is pulled.

*Second*, and as a consequence of the one-time nature of the adjustment, it is *Plaintiffs*' interpretation that requires adding words to the Adjustment Provision—to prescribe that the adjustment for each year occur annually instead of all at once. This could be accomplished by inserting "every year thereafter" or "annually" after the phrase "shall be adjusted." But these words are found nowhere in the Provision.

*Third*, as Plaintiffs concede, the Variable Factor Approach would require even more added words: text imposing an obligation to continue to calculate and publish Actual Real GDP in 1993 base prices for the life of the Securities. (Pls.' Br. 46-48.) The Court has *already* refused to imply any such requirement, recognizing that "[b]y their terms, the Global Securities do not require the Republic to compel INDEC to publish data, and the Court will not impose such an obligation." *Aurelius II*, 2021 WL 1177465, at *9. The absence of such a covenant—even though the governing Trust Indenture has an *entire section* dedicated to covenants (*see* Ex. 35 (2005 Indenture) Art. 3)—strongly suggests that no one expected these figures (a whole GDP series in an increasingly obsolete base year) to continue to be published following a rebasing and until 2034. Even more so since it is undisputed that no country has *ever* continued publishing its official GDP statistics in an outdated base year. (Pls.' Resp. SOF ¶ 134.)

The Global Security elsewhere suggests that having two base years at once was not intended.  It expressly provides for INDEC to *transition* from one base year to another, rather than publishing in two.  (Arg. Ex. 37 at R-5 ("[I]f the calendar year employed by INDEC for purposes of determining Actual Real GDP shall at any time be a calendar year other than the year 1993, then the Year of Base Prices shall mean such other calendar year.").)  "Actual Real GDP"—the key economic indicator in the Security—is then expressly *defined by* "the Year of Base Prices," of which there is only one at a time.  (*Id.* at R-2)  In short, the contract, read as a whole, confirms that no one expected to use real GDP in the old base year for any purpose—which Plaintiffs concede is a "necessary input" for Plaintiffs' calculations.  (Pls.' Br. 44.)

Plaintiffs' *only* textual response is to point to the phrase "such Reference Year" and argue that, instead of meaning different things in the first half of the Adjustment Provision (which prescribes a one-time adjustment) and the second half of the Adjustment Provision (which defines the actual fraction), it must mean the same thing in both places.[21]  This formulaic approach ignores the clear instructions

---

[21] The two cases cited by Plaintiffs (Pls.' Br. 35 n.14) dealt with the repeated use of technical terms in the same contract.  *See Two Farms, Inc.* v. *Greenwich Ins. Co.*, 993 F. Supp. 2d 353, 362 (S.D.N.Y. 2014) ("underground storage tanks and associated piping"); *Iroquois Master Fund, Ltd.* v. *Quantum Fuel Sys. Techs. Worldwide, Inc.*, 2013 WL 4931649, at *2 (S.D.N.Y. Sept. 12, 2013) ("Effective Price").  Neither case stands for the proposition that a commonplace adjective like "such" must refer to the same thing every time it is used.

of the first half of the Provision and also contradicts New York law, which directs courts to "read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases." *S. Rd. Assocs., LLC* v. *Int'l Bus. Machines Corp.*, 4 N.Y.3d 272, 277 (2005); *L. Debenture Tr. Co. of New York* v. *Maverick Tube Corp.*, 595 F.3d 458, 468 (2d Cir. 2010) (similar).  "Single clauses cannot be construed by taking them out of their context and giving them an interpretation apart from the contract of which they are a part," *Arrowgrass Master Fund Ltd.* v. *Bank of N.Y. Mellon*, 965 N.Y.S.2d 473, 475 (1st Dep't 2013), as Plaintiffs try to do.

### C. Plaintiffs' Interpretation Impermissibly Writes the Adjustment Provision and Other Terms out of the Contract.

The Republic's opening brief demonstrated that the mathematical consequence of Plaintiffs' interpretation of the Adjustment Provision actually *eliminates* the entire 115-word clause, as well as the definition of Year of Base Prices, and much of the definitions of Actual Real GDP Growth and Actual Real GDP. Appendix A shows the wide swaths of language deleted by Plaintiffs' interpretation.  The upshot is that the payment conditions and the Payment Amount *do not require* using *adjusted* Base Case GDP at all under Plaintiffs' view of the world.  (Arg. Br. 46-49; Pls.' SOF ¶¶ 160-163.)  Whether to pay and the amount of such payment would be decided by reference to 1993 prices alone.  *Plaintiffs do not substantively dispute that their interpretation of the Adjustment Provision writes the*

*Provision out of the Global Security.*[22]  Indeed, Plaintiffs go so far as to embrace that strange result, arguing that their interpretation "help[s] ensure for holders that a rebasing will not affect their right to payment" and thus that "rebasing does not make a difference."  (Pls.' Br. 37.)

But Plaintiffs have no coherent explanation for why the parties would have gone to the trouble of drafting a 115-word Adjustment Provision (along with the other deleted provisions shown in Appendix A) if they served no purpose.  If the parties had intended for payments to be decided solely by looking at 1993 prices, they (i) would have required the Republic to continue publishing Actual Real GDP in 1993 prices for the life of the Securities (to 2034), and (ii) would *not* have included an Adjustment Provision, the purpose of which is to "translate" old Base Case GDP figures in 1993 prices to the new base year so that payments can be determined with

---

[22] 

(Arg. Ex. 13 (Ostry Dep. Tr.) 91:3-10.)

the more accurate data in the new base year.  New York courts do not interpret contracts by reading out large portions of the contractual language and *reading in* unprecedented and costly obligations.

Plaintiffs' concession that they read the Adjustment Provision out of the contract means their interpretation runs afoul of the longstanding rule under New York law that contracts must be construed "so as not to render any provision meaningless or without force or effect."  *W. & S. Life Ins. Co.* v. *U.S. Bank Nat'l Ass'n*, 173 N.Y.S.3d 543, 549 (2022); *Sunrise Mall Assocs.* v. *Imp. Alley of Sunrise Mall, Inc.*, 621 N.Y.S.2d 662, 663 (1995) ("[A] court should not adopt an interpretation which would leave any provision without force and effect."); *Corhill Corp.* v. *S. D. Plants, Inc.*, 9 N.Y.2d 595, 599 (1961) ("It is a cardinal rule of construction that a court should not 'adopt an interpretation' which will operate to leave a 'provision of a contract . . . without force and effect.'").

Indeed, when confronted "with two conflicting interpretations of [a] contract," New York law rejects the reading that is more consistent with the "plain language" if it renders provisions "superfluous" and "of no effect," and instead follows the interpretation "which best accords with the sense of the remainder of the contract." *Galli* v. *Metz*, 973 F.2d 145, 149 (2d Cir. 1992).  The Republic's interpretation *is* supported by the plain text of the agreement (*see supra* § III.B), but

even if it were not, it must prevail over one that renders numerous contractual provisions superfluous.

### D. Plaintiffs' Interpretation Produces Commercially Unreasonable and Absurd Results.

It is bedrock New York law that "[t]he Court must avoid interpreting a contract in a manner that would be 'absurd, commercially unreasonable, or contrary to the reasonable expectations of the parties.'" *Cambridge Cap. LLC* v. *Ruby Has LLC*, 565 F. Supp. 3d 420, 470 (S.D.N.Y. 2021); *see also Natixis Real Est. Cap. Tr. 2007-HE2* v. *Natixis Real Est. Holdings, LLC*, 149 A.D.3d 127, 139 (1st Dep't 2017) (similar). Plaintiffs do not dispute this. (Pls.' Br. 37-40.) Yet their interpretation fails the test for commercial reasonableness because it (i) uncouples the Payment Conditions and Amounts for a *GDP-linked security* from the Republic's actual GDP, and (ii) assumes, with no evidence, that investors in 2005 and 2010 wanted to instead be paid based on an obsolete measure of economic performance. (*Id.*; Arg. Br. 41-43; 49-50.) Plaintiffs do not dispute the relevant facts and offer only weak and unsupported logic for their interpretation. (Pls.' Br. 37-40.) None holds up.

### 1. An Issuer Would Not Decouple Payments on a GDP-Linked Security From Actual GDP.

Plaintiffs do not dispute that payments on GDP-linked securities should depend on a country's actual economic performance. (Arg. Br. 10, 41-43, 49; Pls.' Br. 37-40.) Indeed, each of Plaintiffs' complaints alleges in sum and substance that

the *GDP-linked* Securities provided for "contingent . . . payments *based on the performance* of the Argentine economy through 2035" so that investors could participate in the "growth of Argentina's economy."  (Aurelius AC ¶ 2 (emphasis added); *see also* 683 AC ¶ 2; Novoriver AC ¶ 2; Adona AC ¶ 2; ACP AC ¶ 2; Arg. Supp. SOF ¶¶ 28-31.)  Yet under Plaintiffs' interpretation, the Republic would be required to pay in years when the economy is experiencing stagnant or even negative growth. (Arg. SOF ¶ 166; *see also* Arg. Ex. 14 (Borensztein Opening Report) ¶¶ 51, 59.)  Payments on the Securities would no longer be "based on the performance of the Argentine economy" as Plaintiffs' own Complaints contend they must.  Their interpretation would "upend the [agreement's] payment structure" and is thus "commercially unreasonable."  *Wells Fargo Bank, N.A.* v. *Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 173 (S.D.N.Y. 2015).

Plaintiffs' only answer to these points is ███████████████████████████ ████████████████████████████ (Pls.' Resp. SOF ¶¶ 30-36.)  But there is no evidence that the Republic agreed to this provision as a concession (it did not (*supra* § III.A)) or that investors even wanted such a provision (they did not, as explained next).

### 2. Investors Would Not Accept a GDP-Linked Security Tied to a Single, Increasingly Obsolete, Base Year.

Plaintiffs next attempt to defend the idea of de-linking payments from actual GDP on the basis that it "help[s] ensure for holders that a rebasing will not affect

their right to payment." (Pls.' Br. 37.) This is just another way of saying that investors would have wanted payments to depend, always and forever, on real GDP performance estimated in the out-of-date and less accurate 1993 base year. Plaintiffs (and the English Court) have made this assertion, but there is no record evidence to support it. It would in fact be nonsensical—even from the perspective of investors— to make such a bargain, because it would offer them no protection.

*First*, there is no evidence that investors had "experience with the 1993 series" sufficient to understand or want to retain it. (Pls.' Br. 10.) Plaintiffs have not produced a single document showing that the 1993 base and underlying methodology were known to any investor or formed any part of their investment decision.[23] ████████████████████████████████████████████ ████████████████████████████████████████ (Arg. Ex. 214 (Kaplan Dep. Tr.) 97:21-98:1; *see also* Arg. Ex. 158 (WASO 30(b)(6) Reference Sheet).) None of this is surprising given the Republic's express warnings to investors that future rebasings could occur and could affect returns on the Securities. (*See, e.g.*, Arg. Ex. 187 (Form 18-K/A, dated December 31, 2006) 7;

---

[23] The Republic requested "[a]ll documents and communications concerning any information that [Plaintiffs] used or relied upon in purchasing, selling, owning, exchanging, trading or otherwise acquiring, transferring, or disposing of the GDP-linked Securities." (Arg. Ex. 191 (Republic's First RFP) ¶ 8; Arg. Supp. SOF ¶ 45.)

Arg. Ex. 253 (2010 Prospectus and Supplement) S-60); Arg. Ex. 252 (2005 Prospectus Supplement) S-33.)

*Second*, the idea that investors would want to be "protected" by using an outdated base year (Pls.' Br. 37-38 (citing Pls.' Ex. 107 ¶¶ 203-204)) is unfounded. A rational investor would much prefer to rely on a figure that is used for a variety of important purposes—like real GDP in the up-to-date base year—rather than a figure calculated and published *solely* to determine whether to make payments under these Securities.  (*See* Arg. Ex. 33 (Borensztein Reply Report) ¶¶ 83-84; Arg. Ex. 14 (Borensztein Opening Report) ¶ 53.) ███████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████  (Arg. Ex. 189 (Ostry Rebuttal Report) ¶ 31; Arg. Ex. 33 (Borensztein Reply Report) ¶¶ 55-59; Arg. Supp. SOF ¶¶ 61-63.)  Underreporting GDP raises the cost of future debt issuance, reduces private investment, and costs politicians elections.  (*Id.*)  But if Plaintiffs had their way, payments under the Securities would be determined *not* by the operative real GDP monitored by the IMF, rating agencies, and other market observers, but by the obsolete 1993 GDP series maintained *only* for calculations under the Securities.  (Arg. Supp. SOF ¶ 64.)  An Aurelius employee identified this "absurd result[]" of Plaintiffs' Variable Factor Interpretation in 2014:  investors would not want the Securities to depend on an

outdated GDP measure "that serves no other purpose."  (Arg. Ex. 56 (March 30, 2014 Email from J. Abbruzzese).)

### 3. None of Plaintiffs' Other Arguments Demonstrate the Reasonableness of Their Interpretation.

Plaintiffs' purported "host of other reasons" why their interpretation is not unreasonable or absurd all fail.  (Pls.' Br. 38-40.)

1. Plaintiffs' argument that their interpretation "ensures the effect of a rebasing on both sides of the propositions" (Pls.' Br. 38), is pure misdirection.  As explained above, under Plaintiffs' interpretation, there *is no adjustment at all*: whether to pay, and how much, depend entirely on the Base Case GDP table in the original Global Security compared to Actual Real GDP in the 1993 base year.  (*See supra* § III.C.)  Under the Republic's interpretation, by contrast, payment depends on comparing the (adjusted) Base Case GDP table to the (rebased) Actual Real GDP in the new Year of Base Prices.  (*See* Arg. Ex. 33 (Borensztein Reply Report) ¶ 40.) There is no "mismatch" in either approach. The difference is that the Republic's approach actually makes an adjustment; Plaintiffs' approach does nothing.

2. Plaintiffs are wrong that it is illogical to require the Republic to choose an overlap year without prescribing a specific method for doing so.  (Pls.' Br. 39.) The contract confers enormous discretion on the Republic to perform "[a]ll calculations necessary to determine Excess GDP" and the Payment Amount, which easily encompasses choices such as selecting an overlap year to adjust the Base Case

GDP table.  (Arg. Ex. 37 R-3, R-4.)  The fact that such calculations are "binding" absent "bad faith, willful misconduct or manifest error" confirms that the Republic must exercise judgment in carrying out its duties under the Securities.  (*Id.*)

3.      In a single sentence, Plaintiffs advance a new argument, not mentioned by their experts, that their interpretation "maintains the relationship between Actual Nominal GDP and the Payment Amount."  (Pls.' Br. 40 (citing Pls.' Ex. 107 ¶ 224).)  Plaintiffs offer no explanation of what this means, and there is none.  They instead cite to the English court, which reached this erroneous conclusion[24] based on expert testimony given there, but Plaintiffs cannot use inadmissible expert opinions from another lawsuit to create a factual dispute at summary judgment.  *Jakobovits as Tr. of Lite Tr. I* v. *PHL Variable Ins. Co.*, 2023 WL 3741993, at *3 (E.D.N.Y. May 31, 2023) (excluding opinions of experts from related case on summary judgment).

**E.      At a Minimum, the Global Security Is Ambiguous as to How an Adjustment Should Be Performed Upon a Rebasing.**

Where contractual "terms 'suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement,' then the agreement is ambiguous."  *Gary Friedrich Enterprises, LLC* v. *Marvel Characters, Inc.*, 716 F.3d 302, 313-14 (2d Cir. 2013).

---

[24] The English court got this point wrong.  There is no "relationship" to be "maintain[ed]" between Actual Nominal GDP and the Payment Amount; that "relationship" only arises after a rebasing (and only under Plaintiffs' interpretation).  (Arg. Ex. 188 (Borensztein U.K. Tr.) 31:25-32:3.)

The Republic maintains that the "reasonably intelligent person," who "is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business," *Revson* v. *Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir. 2000), would discard Plaintiffs' unreasonable interpretation.  Nonetheless, if the Court concludes otherwise, then "[s]ummary judgment is [not] proper" because "the language of the contract is [not] 'wholly unambiguous.'"  *Mellon Bank, N.A.* v. *United Bank Corp. of New York*, 31 F.3d 113, 115 (2d Cir. 1994).

## IV. THE COURT SHOULD DENY PLAINTIFFS' SUMMARY JUDGMENT MOTION BECAUSE THERE ARE TRIABLE ISSUES OF FACT ON THE APPLICATION OF THEIR VARIABLE FACTOR APPROACH.

If the Court adopts Plaintiffs' Variable Factor Approach, Plaintiffs' proffered method for supplying inputs—substituting EMAE for 2013 GDP for the 1993 base year in the denominator of the Adjustment Fraction (Pls.' Br. 61-63)—is impermissible under the language of the Global Security.  As this Court has recognized, replacing Actual Real GDP figures published by INDEC with "alternate statistics not contemplated by the Global Security's plain terms" runs afoul of the requirement to use only "the Republic's gross domestic product that is published by INDEC" as an input for calculations.  *Aurelius I*, 2020 WL 70348, at *7.

The Republic's National Accounts expert, Prof. Glen Hubbard, calculates the necessary inputs using exclusively official INDEC GDP figures.  Prof. Hubbard's method is also faithful to the language of the Adjustment Provision that defines the

relevant fraction (again, assuming Plaintiffs' interpretation).[25]   After replacing defined terms for "Actual Real GDP" and "Reference Year," the fraction has the following denominator for Reference Year 2013:  "the gross domestic product of Argentina for 2013 measured in constant prices for 2004, as published by INDEC, measured in constant 1993 prices."  (*Id.* at R-2-R-5; Arg. Supp. SOF ¶¶ 101-119.) Prof. Hubbard calculated this figure by applying the words above: real GDP for 2013 in 2004 base as published by INDEC, deflated to remove inflation from 1993 to 2004 so that it was "measured in constant 1993 prices" (the "Deflator Method").[26]  (Arg. Supp. SOF ¶ 109.)  Plaintiffs' expert on National Account Statistics was unsure how to interpret this language, but his best "conjecture" was that it means exactly what Prof. Hubbard calculated:  "gross domestic product of Argentina for 2013 in the 2004 base year *and then restated in 1993 prices*."  (Arg. Supp. SOF ¶ 108.)  This figure for real GDP measured in 1993 prices can be used the same way Plaintiffs seek to use EMAE in 1993 prices.  But, unlike Plaintiffs' method, the Deflator Method uses official GDP data published by INDEC, as required by the Global Security and the Court's prior rulings.  *Aurelius I*, 2020 WL 70348, at *7.

---

[25] It reads: "a fraction, the numerator of which shall be the Actual Real GDP for such Reference Year measured in constant prices of the Year of Base Prices, and the denominator of which shall be the Actual Real GDP for such Reference Year measured in constant 1993 prices."  (Arg. Ex. 37 (2005 Global Security) at R-3.)

[26] "Real GDP measured in constant prices" can refer to GDP adjusted for inflation or GDP in a particular base year.  (Arg. Ex. 99 (Hubbard Rebuttal Report) ¶ 18.)

The Deflator Method has at least two additional advantages over Plaintiffs'
proposal to use EMAE for 2013.  *First*, it is available for 2013 *and all subsequent
years* (Arg. Supp. SOF ¶¶ 118-119), whereas EMAE in the 1993 base year does not
exist for any year after 2013, nor does any similar estimate.  *Second*, the Deflator
Method uses data from the 2004 base year, which better measures Argentina's real-
world economy (Arg. Supp. SOF ¶¶ 110-112, 118), before deflating it to constant
1993 prices—thereby accomplishing the Securities' goal of linking payments to the
most accurate and up-to-date measure of Argentina's economic performance.  (Arg.
SOF ¶¶ 30-37.)

Thus, if the Court were to accept Plaintiffs' Variable Factor interpretation,
material questions of mixed law and fact as to how to apply the Adjustment
Provision would still bar summary judgment.  *Eerie World Ent., L.L.C.* v. *Bergrin*,
2004 WL 2712197, at *3 n.32 (S.D.N.Y. Nov. 23, 2004) ("[Where] the resolution of
a disputed issue hinges in large measure upon conflicting opinions and judgments of
expert witnesses, summary judgment is not appropriate.") (quoting *Klein* v.
*Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir. 1979)).

## V.    THE COURT SHOULD DENY PLAINTIFFS' SUMMARY JUDGMENT MOTION BECAUSE THE REPUBLIC'S AFFIRMATIVE DEFENSES RAISE TRIABLE ISSUES OF FACT.

Plaintiffs make a passing argument that all of the Republic's affirmative
defenses "lack merit and should be dismissed as a matter of law based on the

undisputed facts." (Pls.' Br. 72.)  In fact, the Republic's affirmative defenses of champerty and mutual mistake raise disputed factual questions that preclude summary judgment for Plaintiffs.

*Champerty.*  An entity or person that acquires a security "with the intent and for the purpose of bringing an action or proceeding thereon" has engaged in champerty, and its claim is barred.  N.Y. Judiciary Law § 489(1); *Justinian Cap. SPC* v. *WestLB AG*, 28 N.Y.3d 160, 163 (2016).  This rule "prevent[s] the resulting strife, discord and harassment which could result from permitting . . . corporations to purchase claims for the purpose of bringing actions thereon." *Elliott Associates, L.P.* v. *Republic of Peru*, 961 F. Supp. 83, 86 (S.D.N.Y. 1997).

1.     There are questions of fact as to whether nearly all of Plaintiffs' purchases after the December 2014 No Payment announcement were champertous. Plaintiffs are wrong that champerty is limited to an attorney's purchase of claims to secure "costs." (Pls.' Br. 73.)  The Court of Appeals expressly "reject[ed]" that purported limitation, which "hark[ens] back to earlier cases, from before 1907." *Justinian Cap. SPC*, 28 N.Y.3d at 167 n.3.  Plaintiffs also make the bald assertion— contrary to the express language of N.Y. Judiciary Law § 489(1)—that it is never champertous to "acquire[] a debt instrument for the purpose of enforcing it" by litigation. (Pls.' Br. 73 (quotation omitted).)  But as Plaintiffs' cited cases make clear, that exception applies only where the plaintiff *"holds a preexisting proprietary*

interest" in the debt instrument.  *Tr. For the Certificate Holders of Merrill Lynch Mortg. Invs., Inc.* v. *Love Funding Corp.*, 13 N.Y.3d 190, 195-200 (2009).  Plaintiffs, other than Ape Group, had no such pre-existing interest in the Securities.

Plaintiffs assert that they "purchased the [Securities] because they perceived them to be good investments" rather than to pursue litigation.  (Pls.' Br. 73-74.)  The record plainly shows the opposite—for at least nine of the 10 groups of Plaintiffs,[27] the timing of their purchases strongly suggests that their principal motive was to file suit, and internal documents confirm that motivation.  (Arg. SOF ¶¶ 213-218; Arg. Supp. SOF ¶¶ 120-154; Appendix B.)  For example:

- ██████████████████████████████████ ██████████████████████████████████ ████████████████████████ (Arg. SOF ¶ 213; Arg. Supp. SOF ¶ 127; *see BSC Assocs., LLC* v. *Leidos, Inc.*, 91 F. Supp. 3d 319, 327-29 (N.D.N.Y. 2015) (dismissing claims for champerty because plaintiff "was formed solely to 'retain' [a] cause of action" without any "proprietary interest in the [contract] underlying th[e] action that predate[d] the transfer of claims to [it]").)

---

[27] While the Republic accepts that acquisitions before the No Payment Announcement are not champertous, only Ape Group made all purchases before the Announcement.  Aurelius Capital Management Plaintiffs and 683 Capital Partners, LP purchased most of their holdings *after* the Announcement, while Adona LLC, Egoz Plaintiffs, Mastergen, LLC, Erythrina, LLC, AP Plaintiffs, and WASO purchased *all* of their holdings after this date.  (Arg. Supp. SOF ¶¶ 124, 126, 135, 138, 141, 143, 145, 151-152; Appendix B.)  Novoriver failed to produce records to establish the timing of its acquisitions.  (Arg. Supp. SOF ¶ 155.)



■ ███████████████████████
(*See supra* at § I.C; Arg. SOF ¶¶ 213, 224-225; Arg. Supp. SOF ¶¶ 132-135.)

■ ███████████████████████
(Arg. Supp. SOF ¶ 139.)

Plaintiffs argue that their transactions cannot be champertous because "the Aurelius Plaintiffs (and other holders) repeatedly sought to resolve the claim at issue . . . before bringing litigation." (Pls.' Br. 73.)  Not so.  Aurelius sent one letter in 2017, and none of the other Plaintiffs made even this meager attempt.[28]   And Plaintiffs' deposition testimony is littered with admissions that they acquired the Securities in order to bring this lawsuit.  (Arg. SOF ¶¶ 214-217; Arg. Supp. SOF ¶¶ 120-121, 123, 127-131, 136-137, 144, 146, 148-150, 153-154.)

At best for these Plaintiffs, the motives behind their purchases raise a factual dispute requiring "a weighing of evidence or a credibility determination," which precludes summary judgment in their favor. *Bluebird Partners, L.P.* v. *First Fidelity Bank, N.A.*, 94 N.Y.2d 726, 738 (2000) (summary judgment improper on champerty

---

[28] Plaintiffs point to correspondence from Mr. Dublin of Akin Gump, but such correspondence was on behalf of holders of Euro-denominated Securities, not Plaintiffs.  (*See* Arg. Resp. SOF ¶¶ 171-172, 175-182.)

defense where "primary purpose for the purchases" was in doubt); *see also Sprung*
v. *Jaffe*, 3 N.Y.2d 539, 544 (1957) ("[T]he question of the intent and purpose of the
purchaser . . . is generally one of fact to be decided by the trier of the facts.").

2.    Plaintiffs have not shown that each of their acquisitions qualifies for
the champerty statute's "safe harbor."[29]   Plaintiffs assert that "[e]ach Plaintiff, or
group of jointly managed Plaintiffs, ha[d] an aggregate purchase price significantly
in excess of $500,000"—over however many years and transactions in which they
bought the Securities.  (Pls.' Br. 72 (citing Pls.' SOF ¶¶ 224-35).)   But the safe
harbor expressly applies to individual transactions—"*any* assignment, purchase, or
transfer hereafter made of one or more bonds . . . having an aggregate purchase price
of at least" $500,000—and not to the sum of all the purchase prices for all
assignments, purchases, or transfers by a plaintiff over some undefined period.  N.Y.
Judiciary Law § 489(2) (emphasis added).  Here, Plaintiffs acquired their Securities
through numerous discrete transactions over several years, many of which do not
exceed the $500,000 safe harbor threshold.  (*See* Arg. Supp. SOF ¶¶ 126, 135, 138,
141, 143, 152; Appendix B.)

---

[29] All transactions by two of the nine Adona Plaintiffs (Adona LLC and AP 2016 I)
are within the safe harbor.  Because Plaintiff Novoriver refused to produce the
necessary records, it cannot invoke the safe harbor.  (Arg. Supp. SOF ¶ 155.)

*Mutual Mistake.*   A mutual mistake exists when an agreement "does not reflect a meeting of the minds." *Indep. Order of Foresters* v. *Donaldson, Lufkin & Jenrette Inc.*, 919 F. Supp. 149, 153 (S.D.N.Y. 1996).   The "mutual mistake must exist at the time the contract is entered into and it must be substantial." *Id.*; *see also Healy* v. *Rich Prod. Corp.*, 981 F.2d 68, 73 (2d Cir. 1992).   A party asserting mutual mistake "may rely on extrinsic evidence even if the agreement is not ambiguous." *True* v. *True*, 882 N.Y.S.2d 261, 263-64 (2d Dep't 2009).

If the Court were to find that the Adjustment Provision as written requires the Variable Factor Approach (and it should not), then there are—at least—disputed factual questions as to whether it contains a mutual mistake.   Specifically, at the time of the 2005 and 2010 Exchange Offers, both the Republic and investors shared the same assumption as to the operation of the Securities: that when a rebasing occurred, Base Case GDP would be adjusted to the new Year of Base Prices while preserving the predetermined growth rate at or above 3%.   (*See supra* § III.A.)   In light of the parties' contemporaneous understanding of the Securities, the Republic's mutual mistake defense cannot be rejected at this stage.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and grant the Republic's motion for summary judgment.

Respectfully,


/s/ Robert J. Giuffra, Jr._____
Robert J. Giuffra, Jr.
Sergio J. Galvis
Amanda F. Davidoff
Thomas C. White

SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004-2498
Telephone:   (212) 558-4000
Facsimile:    (212) 558-3588

*Counsel for the Argentine Republic*

August 23, 2023